EDWARD G. POPLAWSKI, State Bar No. 113590
epoplawski@wsgr.com
LISA D. ZANG, State Bar No. 294493
lzang@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071-2027
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

Attorneys for Plaintiff
Royal Holdings Technologies Corp.
d/b/a X.Labs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROYAL HOLDINGS TECHNOLOGIES CORP. D/B/A X.LABS**, a Delaware corporation, | CASE NO.: 2:20-cv-4093 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** |
| **IP VIDEO MARKET INFO INC.**, a Hawaii corporation, | **(2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| Defendant. | **(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| | **(4) DEFAMATION (CAL. CIV. CODE § 44 *ET SEQ.*);** |
| | **(5) TRADE LIBEL;** |
| | **(6) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*);** |
| | **(7) COMMON LAW UNFAIR COMPETITION;** |
| | **(8) FALSE DESCRIPTION AND FALSE REPRESENTATION (<ins>15 U.S.C. § 1125(a)</ins>); AND** |
| | **(9) FALSE DESCRIPTION AND FALSE REPRESENTATION (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*);** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff Royal Holdings Technologies Corp. d/b/a/ X.Labs ("X.Labs") alleges as follows for its Complaint against Defendant IP Video Market Info Inc. ("IPVM"):

## L.R. 8-1 JURISDICTIONAL STATEMENT

1.      This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this case involves federal questions arising under the Trademark Act of 1946 ("Lanham Act"), as amended, 15 U.S.C. § 1051 *et seq*., and related intentional interference with contractual relations, intentional interference with prospective economic relations, negligent interference with prospective economic relations, defamation, trade libel, unfair competition, and false description and false representation, including Cal. Civ. Code § 44 *et seq*., Cal. Bus. & Prof. Code § 17200 *et seq*., and Cal. Bus. & Prof. Code § 17500 *et seq*.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1338(b) and 1367(a) over the asserted state law claims.  This Court's jurisdiction is also invoked pursuant to 28 U.S.C. § 1332, as this action involves a controversy between citizens of different states and an amount in controversy which exceeds the value of $75,000, exclusive of interest and costs.

## NATURE OF THE CASE

2.      This case concerns IPVM's unlawful and malicious publication of false, misleading, deceptive, disparaging, and defamatory statements regarding X.Labs and its proprietary Feevr system.

3.      X.Labs launched the Feevr system on March 25, 2020, against the backdrop of an ongoing worldwide pandemic of Coronavirus Disease 2019 ("COVID-19").  COVID-19 is highly infectious and affects different people in different ways, with symptoms in infected individuals ranging from no symptoms or mild symptoms to severe illness and death.  One of the common symptoms of COVID-19 is fever.

4.      X.Labs' Feevr system is a proprietary, artificial intelligence ("AI")-based thermal screening system.  The Feevr system performs a preliminary scan to efficiently and effectively screen and detect individuals in a crowd with an elevated forehead skin temperature.  Those individuals may then be isolated for secondary screening and medical examination.  The non-contact nature of the Feevr system reduces the risk of cross-infection between the user and individuals screened.

5.      IPVM has published articles containing an abundance of false, misleading, disparaging, and deceptive statements regarding the Feevr system, including articles published on or about March 31, 2020, April 14, 2020, and April 17, 2020, respectively entitled "USA's Feevr Thermal System Examined," "Beware Of Feevr," and "FDA 'Does Not Intend to Object' To Unapproved Fever Detection Cameras" (collectively, "Articles," "IPVM Articles," or "IPVM's Articles").  Since the publication of the IPVM Articles, numerous X.Labs customers have terminated or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing so.  IPVM's false, misleading, disparaging, and deceptive statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.  On information and belief, at least some of X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to the IPVM Articles.  The IPVM Articles have caused and continue to cause great and irreparable harm to X.Labs' business reputation, goodwill, and integrity and to sales of its Feevr system.  On information and belief, IPVM knew or should have known that its publication of the Articles would harm X.Labs.

6.      Despite X.Labs' demands that IPVM immediately retract and disavow the IPVM Articles, IPVM has maintained the IPVM Articles publicly available on its website and to its claimed "10,000+" subscribers and actively encouraged the

dissemination of the Articles and the false, misleading, disparaging, and deceptive statements in the IPVM Articles.  IPVM has also refused X.Labs' request that IPVM provide any and all information, including any documentation, as to any tests or analyses that IPVM or any entity on IPVM's behalf has done on the Feevr system and to set forth the credentials and experience of each person that IPVM believes qualifies IPVM or any third party acting on its behalf to reliably and accurately test and evaluate the Feevr system.  In light of the harm that IPVM's numerous false, misleading, disparaging, and deceptive statements have inflicted and continue to inflict to X.Labs' sales of the Feevr system and, moreover, to its business reputation, goodwill, and integrity, X.Labs has no choice but to seek judicial relief through this action.

## THE PARTIES

7.     X.Labs is a corporation organized under the laws of Delaware and registered to do business in California with its principal place of business located at 8560 Sunset Boulevard, 10th Floor, West Hollywood, California 90069.

8.     IPVM is a for-profit corporation organized under the laws of Hawaii with its principal place of business located at 3713 Linden Street, Suite B, Bethlehem, Pennsylvania 18020.  On information and belief, IPVM is funded by its subscription-based memberships and has members across the United States, including in the Central District of California.  IPVM has a website through which its subscribers and members and the public access IPVM's content.  IPVM makes subscriber and member content on its website available to the general public from time to time.  IPVM has made the IPVM Articles available to the general public. IPVM's website is interactive in that it allows for comment and dialogue among subscribers, members, the public, and IPVM.  On information and belief, IPVM provides online courses to individuals across the United States, including individuals in the Central District of California, and provides certifications for

1  individuals who pass its online courses across the United States, including

2  individuals in the Central District of California.

3  **JURISDICTION AND VENUE**

4  9.     This Court has subject matter jurisdiction over this action pursuant to

5  28 U.S.C. §§ 1331 and 1338(a), as this case involves federal questions arising

6  under the Lanham Act, as amended, 15 U.S.C. § 1051 *et seq*., and related

7  intentional interference with contractual relations, intentional interference with

8  prospective economic relations, negligent interference with prospective economic

9  relations, defamation, trade libel, unfair competition, and false description and

10 false representation, including Cal. Civ. Code § 44 *et seq*., Cal. Bus. & Prof. Code

11 § 17200 *et seq*., and Cal. Bus. & Prof. Code § 17500 *et seq*.  This Court has

12 supplemental jurisdiction pursuant to 28 U.S.C. §§ 1338(b) and 1367(a) over the

13 asserted state law claims.

14 10.     This Court also has subject matter jurisdiction over this action

15 pursuant to 28 U.S.C. § 1332, as this action involves a controversy between

16 citizens of different states and an amount in controversy which exceeds the value

17 of $75,000, exclusive of interest and costs.  X.Labs is organized under the laws of

18 Delaware and has its principal place of business in California.  IPVM is organized

19 under the laws of Hawaii and has its principal place of business in Pennsylvania.

20 11.     This Court has personal jurisdiction over IPVM because IPVM has

21 committed acts of intentional interference with contractual relations, intentional

22 interference with prospective economic relations, negligent interference with

23 prospective economic relations, defamation, trade libel, unfair competition, and

24 false description and false representation in the Central District of California, and

25 otherwise has purposefully directed activities toward the Central District of

26 California that the asserted causes of action arise out of or relate to.

27 12.     Venue is proper in this District under 28 U.S.C. §§ 1391(a), (b), and

28 (c) in that a substantial part of the events or omissions giving rise to this action

COMPLAINT                                            5

1    occurred in this District and for the same reasons alleged in the preceding

2    paragraph as to why IPVM is subject to personal jurisdiction.

3                                    **BACKGROUND**

4          13.    There is an ongoing worldwide pandemic of COVID-19 caused by

5    Severe Acute Respiratory Syndrome Coronavirus 2 ("SARS-CoV-2").  COVID-19

6    is a highly infectious disease.  There is currently no vaccine to prevent COVID-19.

7    Nor is there currently any specific anti-viral treatment for COVID-19.

8          14.    COVID-19 was first identified in December 2019 in Wuhan, Hubei

9    Province, People's Republic of China.  On January 30, 2020, the World Health

10   Organization declared the COVID-19 outbreak to be a public health emergency of

11   international concern.  On January 31, 2020, the U.S. Secretary of Health and

12   Human Services declared a public health emergency under Section 319 of the

13   Public Health Service Act, 42 U.S.C. § 247d, in response to COVID-19.  On

14   March 11, 2020, the World Health Organization recognized the COVID-19

15   outbreak as a pandemic.  On March 13, 2020, the U.S. President declared the

16   COVID-19 outbreak a national emergency as of March 1, 2020.

17         15.    As of May 3, 2020, there are 1,122,486 total confirmed cases of

18   COVID-19 resulting in 65,735 deaths in the U.S.  *See*

19   https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

20         16.    COVID-19 affects different people in different ways.  A wide range of

21   symptoms has been reported in individuals with COVID-19, ranging from no

22   symptoms or mild symptoms to severe illness and, in some cases, death.  These

23   symptoms may appear 2-14 days after exposure to the virus.  On average, it takes

24   5-6 days from infection with the virus for symptoms to show in an individual.

25         17.    Common symptoms of COVID-19 include fever, cough, and shortness

26   of breath or difficulty breathing.  Initial screening measures for individuals with no

27   symptoms, i.e., asymptomatic individuals, have included measurements for

28   elevated body temperature.

## THE FEEVR SYSTEM

18.     On March 25, 2020, X.Labs launched its proprietary Feevr system.

19.     The Feevr system is a proprietary AI-based rapid thermal screening system.  *See* https://www.feevr.tech/.  The Feevr system performs a preliminary scan to efficiently and effectively screen and detect individuals in a crowd with an elevated forehead skin temperature.  The Feevr system includes an oral thermometer for secondary screening if the preliminary scan indicates that an individual has an elevated forehead skin temperature.

20.     The Feevr system includes a proprietary AI-based mobile app integrated into a smartphone connected to a thermal imaging camera, such as the Flir One Pro camera.  The thermal imaging camera acquires a thermal image.  The mobile app processes the thermal image using a proprietary AI-based face detection algorithm to determine whether an individual's forehead skin temperature exceeds a predetermined input threshold.  An elevated forehead skin temperature is a possible indicator of COVID-19.

21.     The Feevr system is illustrated in the image below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   22.   The thermal images acquired by the Feevr system may be illustrated

16   by the following exemplar, created by X.Labs:

17
18
19
20
21
22
23
24
25



26   23.   In particular, the Feevr system detects the skin temperature of the

27   region of an individual's forehead that has a direct correlation to the temporal

28

artery.  To enhance accuracy, the Feevr system disregards other temperatures in the field of view.  The average skin temperature range for the forehead is 90.5-95.2°F.

24.     At this time, the Feevr system tends to function optimally in stable air temperatures, such as in an enclosed environment.  Indeed, a number of variables can affect the accuracy of surface skin temperature measurement, including, but not limited to, indoor and outdoor air temperature, alcohol consumption, exercise, wind chill, and direct sunlight.

25.     When the Feevr system detects an individual's skin temperature as reaching or exceeding the input threshold, the system automatically displays a visual alert and captures and stores a screenshot of the thermal image.  In addition, a rectangle around the face of the individual detected as having an elevated forehead skin temperature will turn red.  The default threshold skin temperature on the Feevr system is 98.0°F.  Under this default threshold, an individual with a forehead skin temperature of 98.0°F or greater would be identified as having an elevated forehead skin temperature, thus triggering the use of an oral thermometer for secondary screening.  The Feevr system can be used to manually capture a screenshot of the thermal image, as well.

26.     Thus, the Feevr system enables the user to rapidly identify individuals with an elevated forehead skin temperature from a distance and without making direct body contact.  The non-contact nature of the Feevr system and the distance from which it can be used reduce the likelihood of cross-infection between the user and individuals tested.  Individuals identified as having an elevated forehead skin temperature may be discreetly isolated for secondary screening and medical examination.

27.     X.Labs' "Disclaimer" webpage states as follows:

> "***Feevr is not a medical device and is not intended for any diagnosis or clinical measurements.  Feevr is only to be used to perform a preliminary scan*** and is intended for

1     screening individuals or monitoring an individual for

2     potential elevated skin temperatures. ***It is not a substitute***

3     ***for a clinical thermometer***.  Always use a clinical

4     thermometer as a secondary screening protocol when high

5     accuracy body temperature measurements are required."

6  *See* https://www.feevr.tech/disclaimer (emphases added).

7        28.     X.Labs' "Disclaimer" webpage for the Feevr system additionally

8  states as follows:

9     "It should be noted that the usual 98.6-degree normal

10    reading is for core body temperature, not skin temperature,

11    which is usually considerably lower, rising and falling with

12    the ambient temperature and ranges between 89.0 F –

13    98.0F[.]  Skin temperature depends on air temperature and

14    time spent in that environment.  The normal temperature of

15    the skin is about 33 °C or 91 °F. . . . With Feevr, an

16    average temperature is calculated by taking the

17    temperature on 2 spots on the face, the inner eyelid and the

18    forehead.  This combined temperature gives the most

19    accurate display of whether or not an elevated body

20    temperature is present.  The optimal use for the feevr

21    device will be in a stable, room temperature, indoor

22    environment and have the person being scanned, adjust to

23    the stable environment, if entering from outside, before

24    being scanned by the fever device.  Environmental impacts

25    such as direct sunlight, alcohol consumption and exercise

26    does increase the skin temperature."

27  *Id.*

28

COMPLAINT                                    10

29.     At least as early as April 11, 2020, X.Labs published a document entitled "Visual Presentation of Temperature" on the Feevr system's website ("VPOT Document").  A true and correct copy of the VPOT Document is attached as **Exhibit 1** to this Complaint.

30.     The VPOT Document sets forth tables of various skin temperatures, ranging from 90.5°F to 101.9°F in a "Fahrenheit (°F)" table and ranging from 32.5°C to 38.8°C in a "Celsius (°C)" table, and their respective corresponding core temperatures.  A copy of the first page of the VPOT Document, which contains these tables, is reproduced below:



31.     The VPOT Document indicates whether each indicated skin temperature and corresponding core temperature is "[a]verage," warrants "[c]aution," is "[a]pproaching fever temperature," or "[n]eeds additional screening."  The VPOT Document states that "92°F (33.3°C) reading on the skin of the forehead implies the individual is perfectly normal when it comes to their temperature and means the individual does not need additional screening."  The VPOT Document also states that a "[s]kin temperature below 90.5 is due to external factors," which are identified as "includ[ing] but not limited to indoor/outdoor air temperature, alcohol consumption, exercise, wind chill, and/or direct sunlight."  The VPOT Document indicates that a skin temperature of or exceeding 96.8°F is "[a]pproaching fever temperature" and a skin temperature of or exceeding 98.4°F "[n]eeds additional screening."  Additionally, the VPOT Document prominently states that the Feevr system "***should be used as a screening device to identify individuals that need further monitoring or medical testing to determine if they are sick or exhibiting a high fever and showing signs consistent with a virus.***" (emphasis in original).

32.     The VPOT Document cites an article entitled "Estimation of Mean Body Temperature from Mean Skin and Core Temperature" by Rainer Lenhardt, M.D. and Daniel I. Sessler, M.D., published in December 2006 in the academic journal "Anesthiology" and on the "Anesthesiology" website at https://anesthiology.pubs.asahq.org/article.aspx?articleid=1931065, in support of the statement in the VPOT Document that "[t]he feevr unit measures the temperature of the skin on the forehead which is directly correlated to the core temperature, which typically is 3.6°F - 7.2°F (2.0°C - 4.0°C) higher than the skin temperature."  Also, the VPOT Document cites an article entitled "Body Temperature: What Is (and Isn't) Normal?" by Cleveland Clinic, dated March 31, 2020 and published on the Cleveland Clinic website at https://health.clevelandclinic.org/body-temperature-what-is-and-isnt-normal/, in support of the statements in the VPOT

1  Document that "[a]verage human body temperature is between 97.5°F - 99.5°F
2  (36.4°C - 37.5°C)" and "[w]hen a person has a fever, their core temperature is
3  elevated to 100.5°F (38.1°C)2 and higher."

4  **IPVM**

5      33.   IPVM is a for-profit company that touts itself as "the world's leading
6  authority on video surveillance." *See* https://ipvm.com/about.  In its corporate
7  filings, IPVM characterizes its business as a "Domestic Profit Corporation" formed
8  for the purpose of "INTERNET VIDEO SURVEILLANCE INFORMATION
9  SERVICES."  IPVM's federally registered service mark for the word "IPVM" is
10  indicated for the Goods and Services class of "[p]roviding a web site featuring
11  technology that enables users to select and design video surveillance."  In addition,
12  IPVM describes itself as "a team of 15 with extensive experience working for
13  security integrators, organizations, and manufacturers," with "dedicated specialists
14  covering cameras, video analytics, VMS, IP networking, access control and more."
15  *Id*.  In essence, IPVM's focus is in the area of video surveillance and related areas
16  within the security field.  IPVM does not have any specialized knowledge, training,
17  or experience with any thermal imaging system or any system for assessing skin or
18  body temperature of a human being.  With the possible exception of the Feevr
19  system, IPVM has never tested or analyzed any thermal imaging system or any
20  system for assessing skin or body temperature.

21      34.   According to IPVM's website, IPVM offers live online courses,
22  where it teaches video surveillance and access control.  IPVM markets its online
23  courses as available worldwide, including in the United States and in the Central
24  District of California.  In furtherance of such marketing, IPVM represents that it
25  provides and has provided over 750 certifications for individuals who pass its
26  online courses, including individuals located in Los Angeles, California, Orange
27  County, California, and other locations in the Central District of California.

28

35.     According to IPVM's website, IPVM funds its work through its paid membership subscription service and has members across the world, including in the United States.  IPVM claims that it has "10,000+" members worldwide. IPVM's members include members located in the Central District of California.

36.     IPVM's website indicates that John Honovich ("Mr. Honovich") is the founder and President of IPVM.  According to IPVM's website, Mr. Honovich leads a team of engineers who test, research, and analyze video surveillance and physical security markets.

37.     On information and belief, Mr. Honovich participated in an interview, entitled "COVID-19 Series; The Truth on Fever Detecting Cameras w/ IPVM John Honovich," that was posted on YouTube by ASR Enterprises on April 16, 2020 ("April 16, 2020 Interview").  *See* https://www.youtube.com/watch?v= nDAsX7kdheE.  In the April 16, 2020 Interview, Mr. Honovich stated as follows: "There's not many things you do in video surveillance that is a medical decision." With regard to U.S. Food and Drug Administration ("FDA") 510(K) Clearances and 510(K) PMA, i.e., Premarket Approval, Mr. Honovich stated in the interview that "I'm—I'm not the expert on—on this subcategory."  Further, Mr. Honovich stated in the April 16, 2020 Interview that "virtually 99% of people, including us, we're not experts in the subfield of radiometric thermal—uh, thermal thermography cameras to do fine-grain elevated body temperature capture."  Mr. Honovich also stated in the April 16, 2020 Interview that he is "not an expert in medicine" and "again, not an expert in—in medicine or basically measuring—all the different ways of measuring temperature."

### IPVM'S UNLAWFUL CONDUCT

38.     On or about March 31, 2020, IPVM published an article by Ethan Ace on its website entitled "USA's Feevr Thermal System Examined" ("March 31, 2020 Article").  *See* https://ipvm.com/reports/feevr.  A true and correct copy of the March 31, 2020 Article is attached as **Exhibit 2** to this Complaint.

39.     IPVM's March 31, 2020 Article contains numerous false, misleading, disparaging, and deceptive statements regarding X.Labs and the Feevr system. IPVM asserts in the March 31, 2020 Article that it "spoke with the company [X.Labs] and examined its claims[,] including" "[t]echnical design," "[l]ow pricing," and "[a]ccuracy."  In the March 31, 2020 Article, IPVM repeatedly mischaracterizes X.Labs' marketing and descriptions of its Feevr system as "misleading."

40.     IPVM asserts in the March 31, 2020 Article that the accuracy of the Feevr system is "only ±3°C (~5.4°F)" on the sole basis that "the FLIR One Pro specifies accuracy of only ±3°C (~5.4°F), a huge range for measuring body temperature."  In the same breath, IPVM mischaracterizes X.Labs' description of the Feevr system's accuracy as "one vague claim of being within 0.4°F (0.2°C) of an 'FDA approved temperature gun.'"  IPVM then misleadingly states that "most of the systems we have surveyed claim accuracy of ±0.3° C or lower, only about 0.5° F" without identifying the systems that it refers to or demonstrating that those systems are appropriate for comparison to the Feevr system.  IPVM later states in the March 31, 2020 Article that it is "particularly worried about how accurate this [the Feevr system] will be."

41.     In addition, IPVM claims in the March 31, 2020 Article that "false positives and negatives are highly likely" when using the Feevr system.  In support of this misleading statement, IPVM states that "the forehead and face are highly susceptible to variations caused by environment and activities of the person being screened (e.g. exercising or consuming alcohol)" and references the allegedly "limited accuracy FLIR One Pro camera" used with the Feevr system.  IPVM's claims in this regard, however, omit to mention that the Feevr system's website itself makes clear that a number of variables can affect the accuracy of surface skin temperature measurement and, accordingly, that the Feevr system operates optimally in an enclosed environment at this time.  IPVM's claims also deceptively

omit to mention that the Feevr system is intended to screen and detect individuals with elevated forehead skin temperature for secondary screening and medical testing.

42.     Moreover, IPVM asserts in the March 31, 2020 Article that "the script of one of Feevr's marketing videos is ***mostly stolen*** from a FLIR post titled Thermal Imaging for Detecting Elevated Body Temperature." (emphasis added). IPVM further states in an "update" to the March 31, 2020 Article, ostensibly published after the Article was initially posted, that X.Labs informed IPVM that it has an agreement with Flir and that Flir "responded, denying Feevr's claims."  In support of these statements, IPVM misleadingly refers to a "FLIR SDK License Agreement" that contains no mention of X.Labs or the Feevr system.  In yet another "update," the March 13, 2020 Article acknowledges X.Labs' statement that "Feevr doesn't use the FLIR SDK.  Feevr uses it[]s own custom app with a FLIR camera."  IPVM, however, has not removed any references to the "FLIR SDK License Agreement" from the March 31, 2020 Article.

43.     In connection with publishing the March 31, 2020 Article, IPVM declined X.Labs' offer to provide a unit of its Feevr system to IPVM for analysis and did not even request any technical documentation from X.Labs regarding the Feevr system.  In furtherance of its misleading narrative, IPVM omitted to mention either of these facts in its March 31, 2020 Article.  Instead, IPVM selectively uses "Feevr's own demonstration videos," from which it concludes that the Feevr system "does not appear to work consistently, with some subjects not properly detected until they are nearly out of the scene."  On information and belief, IPVM did not obtain a unit of the Feevr system in connection with its underlying analysis or testing of the Feevr system for the March 31, 2020 Article and did not obtain any units of the Feevr system in connection with any of the IPVM Articles.

44.     Additionally, in the March 31, 2020 Article, IPVM identifies various statements regarding COVID-19 on the Feevr system's website and immediately

states "[b]ut no screening system can detect coronavirus, regardless of what is claimed."  IPVM's assertions in this regard imply that the Feevr system is in fact intended to "detect coronavirus" and that, because the Feevr system does not do so, it must be defective.  The Feevr system, however, is in actuality a screening device for detecting and identifying individuals with elevated forehead skin temperatures for secondary screening and medical examination.

45.    As of the filing of this Complaint, the March 31, 2020 Article remains available to the public on IPVM's website and IPVM has not retracted or disavowed the March 31, 2020 Article.  An IPVM subscription is not required to access the March 31, 2020 Article.

46.    On or about April 14, 2020, IPVM published an article on its website by John Honovich entitled "Beware Of Feevr" ("April 14, 2020 Article").  *See* https://ipvm.com/reports/feevr2.  On information and belief, the VPOT Document was available to IPVM as of IPVM's publication of the April 14, 2020 Article.  A true and correct copy of the April 14, 2020 Article is attached as **Exhibit 3** to this Complaint.

47.    The April 14, 2020 Article begins by stating "Beware of 'Feevr.'"  In conjunction with this ominous narrative, IPVM includes an image depicting the Feevr system next to X.Labs' Founder and Chief Executive Officer ("CEO"), Barry Oberholzer ("Mr. Oberholzer"), with a large "BEWARE" warning sign stamped prominently across the image of the Feevr system at the beginning of the April 14, 2020 Article.  A copy of the image is reproduced below:



48.     IPVM falsely asserts in the April 14, 2020 Article that the Feevr system "fundamentally lacks accuracy for its use, *as its thermal provider FLIR has said and IPVM testing has shown*." (emphasis added).  The April 14, 2020 Article also repeatedly claims that IPVM requested information about the Feevr system and that X.Labs did not provide such information.  This is misleading.  As with the March 31, 2020 Article, IPVM omits to mention in the April 14, 2020 Article that it declined X.Labs' offer to provide a unit of its Feevr system to IPVM for analysis and did not even request any technical documentation from X.Labs regarding the Feevr system.  In addition, IPVM has provided no corroboration of its claimed testing.  On information and belief, IPVM did not obtain a unit of the Feevr system in connection with its underlying analysis or testing of the Feevr system for the April 14, 2020 Article.

49.     In the April 14, 2020 Article, IPVM continues the false and disparaging narrative that the Feevr system "pose[s] risks to the public."  IPVM proclaims therein that "Feevr has no FDA approval for this device" and that "[t]he CEO of Feevr's 'premier US distributor' *admitted* the lack of approval." (emphasis added).  In addition, IPVM deceptively states in the April 14, 2020 Article that "[t]he thermal sensor they are using is not specified nor recommended by their

provider for such a 'feevr' application" and that "Feevr cannot address this."  By these misleading statements, IPVM implies that the Feevr system is intended to be used for purposes requiring FDA approval.  However, IPVM omits to mention that the Feevr system's technical specification itself affirmatively states that the Feevr system is not FDA approved.  As IPVM also omits to mention, the Feevr system is to be used for detecting and identifying individuals with elevated forehead skin temperatures for secondary screening and medical testing.

50.    IPVM falsely claims in the April 14, 2020 Article that the FLIR One Pro used with the Feevr system "perform[s] inaccurately for human temperature detection" and "is 10x less accurate than" FDA approved thermal guns.  Further, IPVM quotes a FLIR spokesperson as "not recommend[ing] the FLIR One Pro . . . device[] for this use case," without identifying what the "use case" is or providing any other context for the subject quote.  Thereafter, on April 21, 2020, IPVM's Ethan Ace posted a follow-up comment on the April 14, 2020 Article that "[f]undamentally, Feevr also does not explain or justify how they are using a sensor which FLIR themselves has said is not accurate enough for thermal screening (±3°C) and getting accurate results."

51.    Moreover, IPVM mischaracterizes examples of the Feevr system's imaging results as exhibiting an "alarming" "sharp divergence in temperatures," showing people "evidently dying of hypothermia or inaccuracy in measurement," and "typical for Feevr's demos."  In furtherance of these mischaracterizations, IPVM misleadingly describes the accuracy of the Feevr system as "nowhere close enough to the precision needed to determine the fine differences between 'normal' body temperatures ~98°F and 'fevers' at ~100°F."  IPVM's misleading and deceptive statements, however, fail to take into account that the Feevr system detects skin temperature rather than internal body temperature, and that a number of variables could impact the accuracy of surface skin measurement.

52.     Additionally, IPVM personally attacks and disparages X.Labs' Founder and CEO, Barry Oberholzer, in the April 14, 2020 Article through improper, irrelevant, false, misleading, and deceptive statements regarding prior allegations and charges against Mr. Oberholzer that have since been dropped. IPVM was aware that the allegations and charges had been dropped at the time that it published the April 14, 2020 Article.  In fact, IPVM included an excerpt of an e-mail from Mr. Oberholzer to IPVM in the April 14, 2020 Article, with the e-mail excerpt stating that "these charges were dropped and were a result of improper representation due to the nature of my career with the government at the time." IPVM's personal attacks and disparagements towards Mr. Oberholzer have harmed Mr. Oberholzer's reputation and have also further harmed the business, reputation, and goodwill of X. Labs.

53.     On or about April 21, 2020 or April 22, 2020, IPVM's Ethan Ace added a comment to the April 14, 2020 Article that cited the VPOT Document. This comment misleadingly characterized the VPOT Document as a "'justification' of their [X.Labs'] visual temperature display" to "justify the delta" "between forehead skin temperature and core body temperature."  The comment further misleadingly and deceptively stated that "[f]undamentally, Feevr also does not explain or justify how they are using a sensor which FLIR themselves has said is not accurate enough for thermal screening (±3°C) and getting accurate results."

54.     As of the filing of this Complaint, the April 14, 2020 Article remains available to the public on IPVM's website and IPVM has not retracted or disavowed the April 14, 2020 Article.  An IPVM subscription is not required to access the April 14, 2020 Article.

55.     On or about April 17, 2020, IPVM published an article by Charles Rollet on its website entitled "FDA 'Does Not Intend to Object' To Unapproved Fever Detection Cameras" ("April 17, 2020 Article").  *See* https://ipvm.com/reports/fda-new.  On information and belief, the VPOT Document was available to

1   IPVM as of IPVM's publication of the April 17, 2020 Article.  A true and correct

2   copy of the April 17, 2020 Article is attached as **Exhibit 4** to this Complaint.

3        56.    At the beginning of the April 17, 2020 Article, IPVM states that the

4   "FDA has declared it will not go after the many companies marketing unapproved

5   fever detection cameras during the coronavirus public health emergency, even

6   though it does consider these products medical devices."  IPVM smears X.Labs in

7   the April 17, 2020 Article by identifying it as one of the "Dubious Companies" that

8   the FDA has "Rewarded."

9        57.    In addition, in the April 17, 2020 Article, IPVM sets forth a list of

10  purported "Problems" with the Feevr system without disclosing that IPVM

11  declined X.Labs' offer to provide a unit of its Feevr system to IPVM for analysis

12  and did not even request any technical documentation from X.Labs regarding the

13  Feevr system.  On information and belief, IPVM did not obtain a unit of the Feevr

14  system in connection with its underlying analysis or testing of the Feevr system for

15  the April 17, 2020 Article.  IPVM falsely and misleadingly states in the Article that

16  "Feevr is also using the wrong kind of camera and when IPVM reported this, they

17  threatened legal action and made false allegations against us."  In addition, IPVM

18  asserts that "[t]he fact that the FDA has (temporarily) given carte blanche to these

19  unregulated products is a big boost for such firms.  But ***it presents a risk to the***

20  ***public***, since often these companies are totally new entrants to the thermal field

21  and do not offer the right kind of camera, setup advice, etc." (emphasis added).

22  Here, IPVM provides no justification of its generalizations and, thus,

23  mischaracterizations of the Feevr system.  In continuance of this misleading

24  narrative, IPVM states in the April 17, 2020 Article that the FDA's decision not to

25  pursue companies marketing unapproved fever detection cameras "could lead to

26  many false positives/negatives and poor implementation," thereby deceptively

27  implying that the Feevr system provides false positives and negatives and is poorly

28  implemented.

COMPLAINT                                          21

1    58.    As of the filing of this Complaint, the April 17, 2020 Article remains
2    available to the public on IPVM's website and IPVM has not retracted or
3    disavowed the April 17, 2020 Article.  An IPVM subscription is not required to
4    access the April 17, 2020 Article.

5    59.    Since the publication of the IPVM Articles, numerous customers of
6    the Feevr system have terminated or suspended their sales agreements with X.Labs
7    for its Feevr system and cited the IPVM Articles in doing so.  On information and
8    belief, X.Labs' prospective customers have similarly severed their business
9    relationships with X.Labs and will not be entering into contracts to purchase
10   X.Labs' Feevr system due to the IPVM Articles.  In addition, IPVM's false,
11   misleading, disparaging, and deceptive statements caused X.Labs' supplier, Flir, to
12   suspend its agreement with X.Labs for a period of time.  As a result, IPVM's
13   Articles have directly caused significant harm to X.Labs' business reputation,
14   goodwill, and integrity and significant loss of sales and potential sales of X.Labs'
15   Feevr system in an amount to be determined at trial.  On information and belief,
16   IPVM's purpose in publishing the March 31, 2020 Article, April 14, 2020 Article,
17   and April 17, 2020 Article was to disrupt X.Labs' contracts, contractual relations,
18   and prospective contractual relationships.

19   60.    On April 22, 2020, counsel for X.Labs sent a letter to IPVM's John
20   Honovich ("April 22, 2020 Letter"), demanding that IPVM promptly confirm in
21   writing that it has ceased and desisted writing or publishing any articles containing
22   false, misleading, deceptive, or defamatory statements about X.Labs or its Feevr
23   system; issue a public retraction of the IPVM Articles that explicitly acknowledges
24   the falsehoods, deceptions, and defamations contained therein; provide all
25   information, including any documentation, regarding any tests or analyses that
26   IPVM or any entity on IPVM's behalf has done on the Feevr system; identify
27   IPVM's credentials and experience that it believes qualifies it to reliably and
28   accurately test and evaluate the Feevr system; explain IPVM's failure to acquire

and use the Feevr system in connection with any testing or assessment of the Feevr system; identify Ethan Ace, Charles Rollet, and John Honovich's credentials and experience, if any, which qualify them to review the Feevr system; and provide a complete and accurate written accounting of the identities and the number of individuals and businesses that have accessed any of the IPVM Articles, among other demands.  A true and correct copy of the April 22, 2020 Letter is attached as **Exhibit 5** to this Complaint.

61.     As of the filing of this Complaint, IPVM has failed to perform any of the demands set forth in X.Labs' April 22, 2020 Letter.  IPVM has refused to retract and disavow the IPVM Articles.  Further, IPVM has failed to provide any corroboration of its alleged testing of the Feevr system.  In addition, IPVM has failed to identify any credentials and/or experience that could qualify it to test and evaluate the Feevr system, whether as to Ethan Ace, Charles Rollet, and John Honovich or otherwise.  And, IPVM has failed to explain its failure to acquire and use the Feevr system, particularly in light of X.Labs' offer to provide a unit of its system, in connection with any testing or assessment of the Feevr system.

62.     Meanwhile, the IPVM Articles have caused and continue to cause great and irreparable harm to X.Labs' business reputation, goodwill, and integrity and to sales of the Feevr system.

## **FIRST CLAIM FOR RELIEF**

### **Intentional Interference with Contractual Relations**

63.     X.Labs repeats and realleges the allegations of the foregoing Paragraphs 1 through 62, as if fully set forth herein.

64.     X.Labs possesses and possessed valid contracts with various customers, including Fortune 500 customers, to provide the Feevr system.  X.Labs also has supplier contracts, notably with Flir.

65.     IPVM is and, at all material times, has been aware of the existence of these contracts.  For example, IPVM states in the April 14, 2020 Article: "we

believe Feevr and SDS that they are selling a lot of these devices [Feevr system] right now."  In addition, IPVM states in the March 31, 2020 Article "[t]he Feevr thermal screening system consists of FLIR One Pro camera" and refers in the April 14, 2020 Article to X.Labs' "thermal provider FLIR."

66.     IPVM engaged in conduct that was calculated to disrupt X.Labs' contractual relations and rights under those contracts and achieved those ends.  In doing so, IPVM has prevented X.Labs from realizing the benefits of these contractual relationships.  To achieve those ends, IPVM has, among other things, published false, misleading, and deceptive statements about X.Labs' Feevr system in the IPVM Articles.  On information and belief, IPVM's purpose in publishing the IPVM Articles and the false, misleading, deceptive statements contained therein was and is to disrupt these contracts.  For example, the March 31, 2020 Article states: "[w]e are particularly worried about how accurate this [Feevr system] will be and how misleading much of their [X.Labs'] marketing is."  In addition, the April 14, 2020 Article is entitled "Beware of Feevr" and begins with the statement "Beware of 'Feevr,'" followed by an image depicting the Feevr system next to X.Labs' Founder and CEO, Barry Oberholzer, with a large "BEWARE" warning sign stamped across the image of the Feevr system.  In addition, IPVM states in the April 14, 2020 Article: "if despite the issues raised by their thermal provider FLIR and the lack of FDA approval, customers want to use such a device for 'fever detection', so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis."  Further, the April 17, 2020 Article claims that there are "[p]roblems" with the Feevr system and states that "these unregulated products" "present[] a risk to the public."

67.     As a result of IPVM's intentional interference with X.Labs' contracts, X.Labs has been harmed and suffered damages in an amount to be proven at trial, including, but not limited to, the revenue and profits that X.Labs would have made but for IPVM's interference.  Indeed, numerous X.Labs customers have terminated

or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing so.  IPVM's false, misleading, disparaging, and deceptive statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.

68.    IPVM's acts were undertaken intentionally and in conscious disregard of X.Labs' rights.  In addition, IPVM's acts were malicious, oppressive, and/or fraudulent.  Therefore, X.Labs should be awarded punitive and exemplary damages sufficient to punish IPVM and to deter similar conduct in the future.

69.    IPVM's conduct indicates that it has no intention to stop harassing X.Labs, and, unless restrained, will not do so, to X.Labs' great and irreparable injury, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to X.Labs' business reputation, goodwill, and integrity amongst its customers.

## SECOND CLAIM FOR RELIEF

## Intentional Interference with Prospective Economic Relations

70.    X.Labs repeats and realleges the allegations of the foregoing Paragraphs 1 through 69, as if fully set forth herein.

71.    Before IPVM's smear campaign, X.Labs was actively developing business relationships to provide the Feevr system to potential customers.  These business relationships would likely have resulted in significant sales by X.Labs of its Feevr system.

72.    IPVM is and, at all material times, has been aware of the existence of X.Labs' prospective contractual relationships.  Indeed, IPVM would not have published the IPVM Articles had it been unaware of these prospective contractual relationships.  On information and belief, IPVM's purpose in publishing the IPVM Articles and the false, misleading, deceptive statements contained therein was and is to disrupt these prospective contractual relationships.  For example, the March 31, 2020 Article states: "[w]e are particularly worried about how accurate this

[Feevr system] will be and how misleading much of their [X.Labs'] marketing is." In addition, the April 14, 2020 Article is entitled "Beware of Feevr" and begins with the statement "Beware of 'Feevr,'" followed by an image depicting the Feevr system next to X.Labs' Founder and CEO, Barry Oberholzer, with a large "BEWARE" warning sign stamped across the image of the Feevr system.  In addition, IPVM states in the April 14, 2020 Article: "if despite the issues raised by their thermal provider FLIR and the lack of FDA approval, customers want to use such a device for 'fever detection', so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis."  Further, the April 17, 2020 Article claims that there are "[p]roblems" with the Feevr system and states that "these unregulated products" "present[] a risk to the public."

73.     IPVM falsely, misleadingly, and deceptively represented to potential X.Labs customers that the Feevr system is inaccurate and poses risks to the public, even though IPVM knew that it had failed to acquire a unit of the Feevr system for analysis when offered by X.Labs and that it had failed to request any technical documentation from X.Labs regarding the Feevr system.  In addition, IPVM made these false, misleading, and deceptive representations even though it knew that it was not qualified to reliably and accurately test, evaluate, and review the Feevr system.  Indeed, IPVM's self-described focus is on video surveillance and security.

74.     IPVM's representations were calculated to disrupt X.Labs' ongoing business negotiations with prospective customers.  IPVM published the IPVM Articles with the intent to induce potential X.Labs customers to sever their business relationships with X.Labs and ensure that they did not enter into contracts to purchase X.Labs' Feevr system.

75.     X.Labs is informed and believes that, because of IPVM's false, misleading, and deceptive representations to potential X.Labs customers, those potential customers severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system.

76.     As a result of IPVM's intentional interference with X.Labs' prospective economic relations, X.Labs has been harmed and suffered damages in an amount to be proven at trial.  Because of IPVM's intentional acts, X.Labs will not realize the revenue and profits—and the concomitant value of further developing the customer relationships with which IPVM's conduct has interfered—from these prospective business relationships that it would have realized, but for IPVM's conduct described herein.  Indeed, numerous X.Labs customers have terminated or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing so.  On information and belief, X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to the IPVM Articles.

77.     IPVM's acts were undertaken intentionally and in conscious disregard of X.Labs' rights to compete fairly in the marketplace.  In addition, IPVM's acts were malicious, oppressive, and/or fraudulent.  Therefore, X.Labs should be awarded punitive and exemplary damages sufficient to punish IPVM and to deter similar conduct in the future.

78.     IPVM's conduct indicates that it has no intention to stop harassing X.Labs, and, unless restrained, will not do so, to X.Labs' great and irreparable injury, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to X.Labs' business reputation, goodwill, and integrity amongst its customers and prospective customers.

### THIRD CLAIM FOR RELIEF

### Negligent Interference with Prospective Economic Relations

79.     X.Labs repeats and realleges the allegations of the foregoing Paragraphs 1 through 78, as if fully set forth herein.

80.     Before IPVM's smear campaign, X.Labs was actively developing business relationships to provide the Feevr system to potential customers.  These

1  business relationships would likely have resulted in significant sales by X.Labs of

2  its Feevr system.

3      81.    IPVM is and, at all material times, has been aware of the existence of

4  X.Labs' prospective contractual relationships.  Indeed, IPVM would not have

5  published the IPVM Articles had it been unaware of these prospective contractual

6  relationships.  On information and belief, IPVM's purpose in publishing the IPVM

7  Articles and the false, misleading, deceptive statements contained therein was and

8  is to disrupt these prospective contractual relationships.  For example, the March

9  31, 2020 Article states: "[w]e are particularly worried about how accurate this

10  [Feevr system] will be and how misleading much of their [X.Labs'] marketing is."

11  In addition, the April 14, 2020 Article is entitled "Beware of Feevr" and begins

12  with the statement "Beware of 'Feevr,'" followed by an image depicting the Feevr

13  system next to X.Labs' Founder and CEO, Barry Oberholzer, with a large

14  "BEWARE" warning sign stamped across the image of the Feevr system.  In

15  addition, IPVM states in the April 14, 2020 Article: "if despite the issues raised by

16  their thermal provider FLIR and the lack of FDA approval, customers want to use

17  such a device for 'fever detection', so be it, but this does pose risks to the public

18  who may depend on this to avoid being infected in this ongoing crisis."  Further,

19  the April 17, 2020 Article claims that there are "[p]roblems" with the Feevr system

20  and states that "these unregulated products" "present[] a risk to the public."

21      82.    IPVM falsely, misleadingly, and deceptively represented to potential

22  X.Labs customers that the Feevr system is inaccurate and poses risks to the public,

23  even though IPVM knew that it had failed to acquire a unit of the Feevr system for

24  analysis when offered by X.Labs and that it had failed to request any technical

25  documentation from X.Labs regarding the Feevr system.  In addition, IPVM made

26  these false, misleading, and deceptive representations even though it knew that it

27  was not qualified to reliably and accurately test, evaluate, and review the Feevr

28  system.  Indeed, IPVM's self-described focus is on video surveillance and security.

83.     IPVM knew or should have known that its false, misleading, and deceptive statements would disrupt X.Labs' ongoing business negotiations with prospective customers if IPVM failed to act with reasonable care.  Nevertheless, IPVM published the IPVM Articles and the false, misleading, and deceptive statements contained therein even though it knew or should have known that doing so would induce potential X.Labs customers to sever their business relationships with X.Labs and ensure that they did not enter into contracts to purchase X.Labs' Feevr system.

84.     X.Labs is informed and believes that, because of IPVM's false, misleading, and deceptive representations to potential X.Labs customers, those potential customers severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system.

85.     As a result of IPVM's interference with X.Labs' prospective economic relations, X.Labs has been harmed and suffered damages in an amount to be proven at trial.  Because of IPVM's acts, X.Labs will not realize the revenue and profits—and the concomitant value of further developing the customer relationships with which IPVM's conduct has interfered—from these prospective business relationships that it would have realized, but for IPVM's conduct described herein.  Indeed, numerous X.Labs customers have terminated or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing so.  On information and belief, X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to the IPVM Articles.

86.     IPVM's conduct indicates that it has no intention to stop harassing X.Labs, and, unless restrained, will not do so, to X.Labs' great and irreparable injury, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to X.Labs' business reputation, goodwill, and integrity amongst its customers and prospective customers.

## FOURTH CLAIM FOR RELIEF

## Defamation, Cal. Civ. Code § 44 *et seq.*

87.   X.Labs repeats and realleges the allegations of the foregoing Paragraphs 1 through 86, as if fully set forth herein.

88.   IPVM made false, misleading, deceptive, disparaging, and defamatory statements in the IPVM Articles that the Feevr system is inaccurate and poses risks to the public and that X.Labs' marketing of the Feevr system is misleading.  For example, the March 31, 2020 Article states: "[w]e are particularly worried about how accurate this [Feevr system] will be and how misleading much of their [X.Labs'] marketing is."  In addition, the April 14, 2020 Article is entitled "Beware of Feevr" and begins with the statement "Beware of 'Feevr,'" followed by an image depicting the Feevr system next to X.Labs' Founder and CEO, Barry Oberholzer, with a large "BEWARE" warning sign stamped across the image of the Feevr system.  IPVM also states in the April 14, 2020 Article: "if despite the issues raised by their thermal provider FLIR and the lack of FDA approval, customers want to use such a device for 'fever detection', so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis."  Moreover, IPVM makes improper, irrelevant, false, misleading, disparaging, and deceptive statements in the April 14, 2020 Article regarding prior allegations and charges against X.Labs' Founder and CEO that have since been dropped.  Further, the April 17, 2020 Article claims that there are "[p]roblems" with the Feevr system and states that "these unregulated products" "present[] a risk to the public."

89.   IPVM made these false, misleading, deceptive, disparaging, and defamatory statements to the public and IPVM's "10,000+" members worldwide, including X.Labs' customers and potential customers and suppliers.  The IPVM Articles are available to the public and to every single one of IPVM's claimed

"10,000+" members worldwide.  The IPVM Articles are thus published to X.Labs' customers and potential customers, as well as to X. Labs' suppliers.

90.    On information and belief, X.Labs' customers and potential customers and suppliers reasonably understood that IPVM's statements were about X.Labs and its Feevr system because X.Labs and the Feevr system were the expressly identified subjects of the IPVM Articles.

91.    On information and belief, X.Labs' customers and potential customers and suppliers reasonably understood IPVM's statements to mean that the Feevr system allegedly is inaccurate, has poor quality, and poses risks to the public, and that X.Labs' marketing of the Feevr system is allegedly misleading.  These statements have induced various X.Labs customers to terminate or suspend their sales agreements for the Feevr system and cite the IPVM Articles in doing so, and, on information and belief, induced potential X.Labs customers to sever their business relationships with X.Labs and not enter into contracts to purchase X.Labs' Feevr system.  Such statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.

92.    The false and defamatory statements published by IPVM in the IPVM Articles are unprivileged.

93.    IPVM failed to use reasonable care to determine the truth or falsity of its statements.  Rather, IPVM knew that these statements were false, misleading, deceptive, and defamatory and acted with reckless disregard of the truth or falsity of these statements.  On information and belief, IPVM knew that it was not qualified to reliably and accurately test, evaluate, and review the Feevr system when it made and published these statements in the IPVM Articles.  IPVM was also aware that the allegations and charges against X.Labs' Founder and CEO had been dropped at the time that it published the April 14, 2020 Article.

94.    IPVM's statements caused X.Labs to suffer significant lost sales revenue and profits from existing and prospective customers and injury to X.Labs'

1   business reputation, goodwill, and integrity amongst its customers and prospective

2   customers and suppliers.  These losses and injuries were the natural and probable

3   result of IPVM's publication of the IPVM Articles and false, misleading,

4   deceptive, and defamatory statements contained therein.  IPVM's statements have

5   a natural tendency to injure and are per se defamatory because they harm X.Labs'

6   sales and business reputation.

7       95.     IPVM's acts to disparage X.Labs and its Feevr system and its

8   publication of provably false, misleading, deceptive, and defamatory statements

9   were undertaken maliciously, intentionally, and in conscious disregard of X.Labs'

10  rights.  Therefore, X.Labs should be awarded punitive damages sufficient to punish

11  IPVM and to deter similar conduct in the future.

12                          **FIFTH CLAIM FOR RELIEF**

13                                  **Trade Libel**

14      96.     X.Labs repeats and realleges the allegations of the foregoing

15  Paragraphs 1 through 95, as if fully set forth herein.

16      97.     IPVM made statements in the IPVM Articles that would be clearly or

17  necessarily understood to disparage the quality, characteristics, and performance

18  of the Feevr system and imply the provably false, misleading, deceptive,

19  disparaging, and defamatory statements that the Feevr system is inaccurate and

20  poses risks to the public and that X.Labs' marketing of the Feevr system is

21  misleading.  For example, the March 31, 2020 Article states: "[w]e are particularly

22  worried about how accurate this [Feevr system] will be and how misleading much

23  of their [X.Labs'] marketing is."  In addition, the April 14, 2020 Article is entitled

24  "Beware of Feevr" and begins with the statement "Beware of 'Feevr,'" followed

25  by an image depicting the Feevr system next to X.Labs' Founder and CEO, Barry

26  Oberholzer, with a large "BEWARE" warning sign stamped across the image of

27  the Feevr system.  IPVM also states in the April 14, 2020 Article: "if despite the

28  issues raised by their thermal provider FLIR and the lack of FDA approval,

customers want to use such a device for 'fever detection', so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis." Further, the April 17, 2020 Article claims that there are "[p]roblems" with the Feevr system and states that "these unregulated products" "present[] a risk to the public."

98.   IPVM made these false, misleading, deceptive, and defamatory statements to the public and IPVM's "10,000+" members worldwide, including X.Labs' customers and potential customers and suppliers.  The IPVM Articles are available to the public and to every single one of IPVM's claimed "10,000+" members worldwide.  The IPVM Articles are thus published to X.Labs' customers and potential customers, as well as to its suppliers.

99.   IPVM's statements in the IPVM Articles that the Feevr system is allegedly inaccurate and poses risks to the public and that X.Labs' marketing of the Feevr system is allegedly misleading are provably false, misleading, deceptive, disparaging, and defamatory.

100.   IPVM's false, misleading, deceptive, disparaging, and defamatory statements published in the IPVM Articles are unprivileged.

101.   IPVM knew that these statements were false, misleading, deceptive, disparaging, and defamatory and acted with reckless disregard of the truth or falsity of these statements.  On information and belief, IPVM knew that it was not qualified to reliably and accurately test, evaluate, and review the Feevr system when it made and published these statements in the IPVM Articles.

102.   IPVM knew or should have recognized that X.Labs' customers and potential customers and suppliers have relied and will continue to rely on the false, misleading, deceptive, and defamatory statements published in the IPVM Articles, resulting in financial loss to X.Labs.  IPVM's false, misleading, deceptive, and defamatory statements in the IPVM Articles have a natural tendency to injure and

1  are per se defamatory because these statements harm X.Labs' business reputation,
2  goodwill, and integrity.

3      103.   IPVM's false, misleading, deceptive, disparaging, and defamatory
4  statements have caused direct financial harm to X.Labs.  These statements have
5  induced numerous X.Labs customers to terminate or suspend their sales
6  agreements for the Feevr system, citing the IPVM Articles in doing so, and, on
7  information and belief, induced potential X.Labs customers to sever their business
8  relationships with X.Labs and avoid entering into contracts to purchase X.Labs'
9  Feevr system.  Thus, these statements caused X.Labs to suffer significant lost sales
10  revenue and profits from existing and prospective customers.  Such statements also
11  caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of
12  time.  These losses and injuries were the natural and probable result of IPVM's
13  publication of the IPVM Articles and statements contained therein.

14      104.   X.Labs is an established business and has been an established
15  business since 2018.

16      105.   IPVM's acts to disparage X.Labs and its Feevr system were
17  undertaken maliciously, intentionally, and in conscious disregard of X.Labs' rights.
18  Therefore, X.Labs should be awarded punitive damages sufficient to punish IPVM
19  and to deter similar conduct in the future.

20              **SIXTH CLAIM FOR RELIEF**
21  **Unfair Competition, Cal. Bus. & Prof. Code § 17200 *et seq.***

22      106.   X.Labs repeats and realleges the allegations of the foregoing
23  Paragraphs 1 through 105, as if fully set forth herein.

24      107.   IPVM's business acts and practices in connection with the IPVM
25  Articles are unlawful, unfair, and fraudulent.  On or about March 31, 2020, April
26  14, 2020, and April 17, 2020, IPVM published the IPVM Articles on its website.
27  Each of the IPVM Articles constitutes false, misleading, and deceptive advertising
28  that the Feevr system is allegedly inaccurate and poses risks to the public.  On

information and belief, IPVM knew that these representations were and are false, misleading, and deceptive and that it was not qualified to reliably and accurately test, evaluate, and review the Feevr system when it made and published these representations in the IPVM Articles.  On information and belief, IPVM has a business interest in publishing its false, misleading, and deceptive statements regarding the Feevr system, for example, by generating increased IPVM membership subscription fees and increased subscriber and member traffic to its website.  On information and belief, individuals who have reviewed the IPVM Articles can be expected to sign up or have signed up for IPVM's subscription fee-based membership in order to access one or more of the Articles and other IPVM articles on similar topics.  IPVM's business acts and practices in connection with the IPVM Articles provide an unfair advantage against X.Labs' contractual relations and prospective contractual relationships and an unfair advantage against X.Labs' ability to maximize sales of the Feevr system.

108.   As a direct, proximate, and foreseeable result of IPVM's wrongful conduct, X.Labs' relations with both its current customers and potential future customers and suppliers have been damaged, thereby injuring X.Labs.  X.Labs has therefore suffered lost sales revenue and profits and injury to its business reputation, goodwill, and integrity as a result of IPVM's conduct alleged herein.

109.   IPVM's actions hereinabove alleged are acts of unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.  As such, X.Labs is entitled to injunctive relief to prohibit IPVM from any further and continued false, misleading, and deceptive advertising regarding the Feevr system under Cal. Bus. & Prof. Code § 17203.  X.Labs is informed and believes that IPVM will continue to make false, misleading, and deceptive representations regarding the Feevr system to X.Labs' customers and prospective customers and suppliers unless and until the court orders IPVM to cease and desist.

1

2

### SEVENTH CLAIM FOR RELIEF

### Common Law Unfair Competition

3      110.   X.Labs repeats and realleges the allegations of the foregoing

4  Paragraphs 1 through 109, as if fully set forth herein.

5      111.   IPVM's business acts and practices in connection with the IPVM

6  Articles are unlawful, unfair, and fraudulent.  On or about March 31, 2020, April

7  14, 2020, and April 17, 2020, IPVM published the IPVM Articles on its website.

8  Each of the IPVM Articles constitutes false, misleading, and deceptive advertising

9  that the Feevr system is allegedly inaccurate and poses risks to the public.  On

10 information and belief, IPVM knew that these representations were and are false,

11 misleading, and deceptive and that it was not qualified to reliably and accurately

12 test, evaluate, and review the Feevr system when it made and published these

13 representations in the IPVM Articles.  On information and belief, IPVM has a

14 business interest in publishing its false, misleading, and deceptive statements

15 regarding the Feevr system, for example, by generating increased IPVM

16 membership subscription fees and increased subscriber and member traffic to its

17 website.  On information and belief, individuals who have reviewed the IPVM

18 Articles can be expected to sign up or have signed up for IPVM's subscription fee-

19 based membership in order to access one or more of the Articles and other IPVM

20 articles on similar topics.  IPVM's business acts and practices in connection with

21 the IPVM Articles provide an unfair advantage against X.Labs' contractual

22 relations and prospective contractual relationships and an unfair advantage against

23 X.Labs' ability to maximize sales of the Feevr system.

24      112.   As a direct, proximate, and foreseeable result of IPVM's wrongful

25 conduct, X.Labs' relations with both its current customers and potential future

26 customers and suppliers have been damaged, thereby injuring X.Labs.  X.Labs has

27 therefore suffered lost sales revenue and profits and injury to its business

28 reputation, goodwill, and integrity as a result of IPVM's conduct alleged herein.

113.   IPVM's conduct indicates that it has no intention to stop its acts of false, misleading, and deceptive advertising regarding the Feevr system, and, unless restrained, will not do so, to X.Labs' great and irreparable injury, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to X.Labs' business reputation, goodwill, and integrity amongst its customers and prospective customers.

## EIGHTH CLAIM FOR RELIEF

### False Description and False Representation, 15 U.S.C. § 1125(a)

114.   X.Labs repeats and realleges the allegations of the foregoing Paragraphs 1 through 113, as if fully set forth herein.

115.   IPVM has published false, deceptive, and misleading statements of fact and false, deceptive, and misleading representations of fact about X.Labs' Feevr system in the IPVM Articles, including as to the qualities, characteristics, and performance of such system and the commercial activities and services of X.Labs.  Such statements of fact and factual representations have caused economic, business, reputational, and goodwill injury to X.Labs.  On information and belief, IPVM had an economic incentive to do so because, among other things, various of its subscribers and members were and are in a competitive position vis-à-vis X.Labs and would thereby benefit from IPVM's aforementioned statements and misrepresentations (including by further disseminating the IPVM Articles).  As a result, IPVM's statements and misrepresentations inflicted business, reputational, and goodwill injury on X.Labs to the benefits of such subscribers and members.  Specifically, and without limitation, IPVM has made false, misleading, and deceptive statements and misrepresentations that the Feevr system is inaccurate and poses risks to the public and that X.Labs' marketing of the Feevr system is misleading.  For example, the March 31, 2020 Article states: "[w]e are particularly worried about how accurate this [Feevr system] will be and how misleading much of their [X.Labs'] marketing is."  In addition, the April 14, 2020 Article is entitled

"Beware of Feevr" and begins with the statement "Beware of 'Feevr,'" followed by an image depicting the Feevr system next to X.Labs' Founder and CEO, Barry Oberholzer, with a large "BEWARE" warning sign stamped across the image of the Feevr system.  In addition, IPVM states in the April 14, 2020 Article: "if despite the issues raised by their thermal provider FLIR and the lack of FDA approval, customers want to use such a device for 'fever detection', so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis."  Further, the April 17, 2020 Article claims that there are "[p]roblems" with the Feevr system and states that "these unregulated products" "present[] a risk to the public."

116.  IPVM's Articles have actually deceived and, on information and belief, have the tendency to deceive a substantial segment of the public and IPVM's claimed "10,000+" members, including X.Labs' customers and prospective customers and suppliers.  Indeed, numerous X.Labs customers have terminated or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing so.  On information and belief, X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to deception by the IPVM Articles.  IPVM's false, misleading, disparaging, and deceptive statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.

117.  On information and belief, in addition to the aforementioned benefits flowing to IPVM's subscribers and members arising out of IPVM's aforementioned statements and misrepresentations, IPVM has a business interest in publishing its false, misleading, and deceptive statements and misrepresentations regarding the Feevr system, for example, by generating increased IPVM membership subscription fees and increased subscriber and member traffic to its website.  On information and belief, individuals who have reviewed the IPVM

Articles can be expected to sign up or have signed up for IPVM's subscription fee-based membership in order to access one or more of the Articles and other IPVM articles on similar topics.

118. IPVM's false, misleading, and deceptive statements and representations and practices are material to and influenced the decisions of X.Labs' supplier, Flir, and the purchasing decisions of X.Labs' customers and, on information and belief, X.Labs' prospective customers due to the public availability of the IPVM Articles and IPVM's readership and circulation of the IPVM Articles. In addition, IPVM's statements were material and influenced such purchasing decisions given the importance of the topic of the IPVM Articles, namely, the accuracy of thermal screening systems during the COVID-19 pandemic. Various X.Labs customers have terminated or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing so. On information and belief, X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to the IPVM Articles. IPVM's false, misleading, disparaging, and deceptive statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.

119. IPVM caused the IPVM Articles and the false, misleading, and deceptive statements and representations contained therein to enter interstate commerce by publishing the IPVM Articles on the Internet and to its claimed "10,000+" subscription members across the U.S. and worldwide.

120. As a result of IPVM's false description and false representation, X.Labs has been and will continue to be harmed and suffer damages in an amount to be proven at trial, including, but not limited to, the revenue and profits that X.Labs would have made but for IPVM's publication of its false, misleading, and deceptive statements. Numerous X.Labs customers have terminated or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing

so.  On information and belief, X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to the IPVM Articles.  IPVM's false, misleading, disparaging, and deceptive statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.  Further, IPVM's Articles have caused great and irreparable harm to X.Labs' business reputation, goodwill, and integrity.

121.   IPVM's acts were undertaken intentionally and were malicious, oppressive, and/or fraudulent.  Therefore, X.Labs should be awarded punitive and exemplary damages sufficient to punish IPVM and to deter similar conduct in the future.

122.   IPVM's conduct indicates that it has no intention to stop harassing X.Labs, and, unless restrained, will not do so, to X.Labs' great and irreparable injury, for which damages would not afford adequate relief, in that they would not completely compensate for the injury to X.Labs' business reputation, goodwill, and integrity amongst its customers and prospective customers.

## NINTH CLAIM FOR RELIEF

## False Description and False Representation, Cal. Bus. & Prof. Code § 17500 *et seq*.

123.   X.Labs repeats and realleges the allegations of the foregoing Paragraphs 1 through 122, as if fully set forth herein.

124.   IPVM has published false, deceptive, and misleading statements of fact and false, deceptive, and misleading representations of fact about X.Labs' Feevr system in the IPVM Articles, including as to the qualities, characteristics, and performance of such system and the commercial activities and services of X.Labs.  Such statements of fact and factual representations have caused economic, business, reputational, and goodwill injury to X.Labs.  On information and belief, IPVM had an economic incentive to do so because, among other things,

various of its subscribers and members were and are in a competitive position vis-à-vis X.Labs and would thereby benefit from IPVM's aforementioned statements and misrepresentations (including by further disseminating the IPVM Articles). As a result, IPVM's statements and misrepresentations inflicted business, reputational, and goodwill injury on X.Labs to the benefits of such subscribers and members. Specifically, and without limitation, IPVM has made false, misleading, and deceptive statements and misrepresentations that the Feevr system is inaccurate and poses risks to the public and that X.Labs' marketing of the Feevr system is misleading. For example, the March 31, 2020 Article states: "[w]e are particularly worried about how accurate this [Feevr system] will be and how misleading much of their [X.Labs'] marketing is." In addition, the April 14, 2020 Article is entitled "Beware of Feevr" and begins with the statement "Beware of 'Feevr,'" followed by an image depicting the Feevr system next to X.Labs' Founder and CEO, Barry Oberholzer, with a large "BEWARE" warning sign stamped across the image of the Feevr system. In addition, IPVM states in the April 14, 2020 Article: "if despite the issues raised by their thermal provider FLIR and the lack of FDA approval, customers want to use such a device for 'fever detection', so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis." Further, the April 17, 2020 Article claims that there are "[p]roblems" with the Feevr system and states that "these unregulated products" "present[] a risk to the public."

125. IPVM knew that these statements were false, misleading, deceptive, disparaging, and defamatory and acted with reckless disregard of the truth or falsity of these statements. On information and belief, IPVM knew that it was not qualified to reliably and accurately test, evaluate, and review the Feevr system when it made and published these statements in the IPVM Articles.

126. IPVM's Articles have actually deceived and, on information and belief, are likely to deceive a substantial segment of the public and IPVM's

1    claimed "10,000+" members, including X.Labs' customers and prospective

2    customers and suppliers.  Indeed, numerous X.Labs customers have terminated or

3    suspended their sales agreements for the Feevr system and cited the IPVM Articles

4    in doing so.  On information and belief, X.Labs' prospective customers have

5    similarly severed their business relationships with X.Labs and will not be entering

6    into contracts to purchase X.Labs' Feevr system due to deception by the IPVM

7    Articles.  IPVM's false, misleading, disparaging, and deceptive statements also

8    caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of

9    time.

10         127.   On information and belief, in addition to the aforementioned benefits

11   flowing to IPVM's subscribers and members arising out of IPVM's

12   aforementioned statements and misrepresentations, IPVM has a business interest in

13   publishing its false, misleading, and deceptive statements and misrepresentations

14   regarding the Feevr system, for example, by generating increased IPVM

15   membership subscription fees and increased subscriber and member traffic to its

16   website.  On information and belief, individuals who have reviewed the IPVM

17   Articles can be expected to sign up or have signed up for IPVM's subscription fee-

18   based membership in order to access one or more of the Articles and other IPVM

19   articles on similar topics.

20         128.   IPVM's false, misleading, and deceptive statements and

21   representations and practices are material to and influenced the decisions of

22   X.Labs' supplier, Flir, and the purchasing decisions of X.Labs' customers and, on

23   information and belief, X.Labs' prospective customers due to the public

24   availability of the IPVM Articles and IPVM's readership and circulation of the

25   IPVM Articles.  In addition, IPVM's statements were material and influenced such

26   purchasing decisions given the importance of the topic of the IPVM Articles,

27   namely, the accuracy of thermal screening systems during the COVID-19

28   pandemic.  Various X.Labs customers have terminated or suspended their sales

agreements for the Feevr system and cited the IPVM Articles in doing so.  On information and belief, X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to the IPVM Articles.  IPVM's false, misleading, disparaging, and deceptive statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.

129.   IPVM publicly made and disseminated and caused the public making and dissemination of the IPVM Articles and the false, misleading, and deceptive statements and representations contained therein in and from the State of California and across the U.S. and worldwide by publishing the IPVM Articles on the Internet and to its claimed "10,000+" subscription members across the U.S. and worldwide.

130.   As a result of IPVM's false description and false representation, X.Labs has been and will continue to be harmed and suffer damages in an amount to be proven at trial, including, but not limited to, the revenue and profits that X.Labs would have made but for IPVM's publication of its false, misleading, and deceptive statements.  Numerous X.Labs customers have terminated or suspended their sales agreements for the Feevr system and cited the IPVM Articles in doing so.  On information and belief, X.Labs' prospective customers have similarly severed their business relationships with X.Labs and will not be entering into contracts to purchase X.Labs' Feevr system due to the IPVM Articles.  IPVM's false, misleading, disparaging, and deceptive statements also caused X.Labs' supplier, Flir, to suspend its agreement with X.Labs for a period of time.  Further, IPVM's Articles have caused great and irreparable harm to X.Labs' business reputation, goodwill, and integrity.

131.   IPVM's acts were undertaken intentionally and were malicious, oppressive, and/or fraudulent.  Therefore, X.Labs should be awarded punitive and exemplary damages sufficient to punish IPVM and to deter similar conduct in the future.

132.   IPVM's actions hereinabove alleged are acts of false description and false representation within the meaning of Cal. Bus. & Prof. Code § 17500 *et seq.* As such, X.Labs is entitled to injunctive relief to prohibit IPVM from any further and continued false, misleading, and deceptive advertising regarding the Feevr system under Cal. Bus. & Prof. Code § 17535.  X.Labs is informed and believes that IPVM will continue to make false, misleading, and deceptive representations regarding the Feevr system to X.Labs' customers and prospective customers and suppliers unless and until the court orders IPVM to cease and desist.

## PRAYER FOR RELIEF

WHEREFORE, X.Labs respectfully requests the Court to enter judgment in favor of X.Labs and against IPVM as to all claims asserted herein as follows:

**First Claim for Relief:**

A.   Granting a judgment that IPVM has violated California common law against intentional interference with contractual relations;

B.   Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of interference with X.Labs' existing contractual and business relationships;

C.   Ordering IPVM to pay damages to X.Labs for all losses and injuries, including compensatory damages according to proof in an amount to be determined at trial;

D.   Awarding punitive damages against IPVM sufficient to punish IPVM for its willful misconduct as alleged herein;

E.   Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

F.   For any and all other relief in accordance with proof or which is equitable and proper.

**Second Claim for Relief:**

A.    Granting a judgment that IPVM has violated California common law against intentional interference with prospective economic relations;

B.    Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of interference with X.Labs' future contractual and business relationships;

C.    Ordering IPVM to pay damages to X.Labs for all losses and injuries, including compensatory damages according to proof in an amount to be determined at trial;

D.    Awarding punitive damages against IPVM sufficient to punish IPVM for its willful misconduct as alleged herein;

E.    Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

F.    For any and all other relief in accordance with proof or which is equitable and proper.

**Third Claim for Relief:**

A.    Granting a judgment that IPVM has violated California common law against negligent interference with prospective economic relations;

B.    Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of interference with X.Labs' future contractual and business relationships;

C.    Ordering IPVM to pay damages to X.Labs for all losses and injuries, including compensatory damages according to proof in an amount to be determined at trial;

D.     Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

E.     For any and all other relief in accordance with proof or which is equitable and proper.

**Fourth Claim for Relief:**

A.     Granting a judgment that IPVM has violated Cal. Civ. Code § 44 *et seq*. and California common law against defamation;

B.     Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of defamation;

C.     Ordering IPVM to pay damages to X.Labs for all losses and injuries, including compensatory damages according to proof in an amount to be determined at trial;

D.     Awarding punitive damages against IPVM sufficient to punish IPVM for its willful misconduct as alleged herein;

E.     Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

F.     For any and all other relief in accordance with proof or which is equitable and proper.

**Fifth Claim for Relief:**

A.     Granting a judgment that IPVM has violated California common law against trade libel;

B.     Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of trade libel;

C.     Ordering IPVM to pay damages to X.Labs for all losses and injuries, including compensatory damages according to proof in an amount to be determined at trial;

D.     Awarding punitive damages against IPVM sufficient to punish IPVM for its willful misconduct as alleged herein;

E.     Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

F.     For any and all other relief in accordance with proof or which is equitable and proper.

**Sixth Claim for Relief:**

A.     Granting a judgment that IPVM has violated Cal. Bus. & Prof. Code § 17200 *et seq*.;

B.     Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of unfair competition;

C.     Awarding damages for unjust enrichment to X.Labs, including disgorgement of IPVM's profits and/or other unjust enrichment in an amount to be determined at trial;

D.     Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

E.     For any and all other relief in accordance with proof or which is equitable and proper.

**Seventh Claim for Relief:**

A.     Granting a judgment that IPVM has violated California common law against unfair competition;

B.   Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of unfair competition;

C.   Awarding damages for unjust enrichment to X.Labs, including disgorgement of IPVM's profits and/or other unjust enrichment in an amount to be determined at trial;

D.   Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

E.   For any and all other relief in accordance with proof or which is equitable and proper.

**Eighth Claim for Relief:**

A.   Granting a judgment that IPVM has violated Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a));

B.   Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of false description and false representation;

C.   Ordering IPVM to pay damages to X.Labs for all losses and injuries and unjust enrichment, including compensatory damages according to proof and disgorgement of IPVM's profits and/or other unjust enrichment in an amount to be determined at trial;

D.   Awarding punitive damages against IPVM sufficient to punish IPVM for its willful misconduct as alleged herein;

E.   Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

F.      For any and all other relief in accordance with proof or which is equitable and proper.

**Ninth Claim for Relief:**

A.      Granting a judgment that IPVM has violated Cal. Bus. & Prof. Code § 17500 *et seq*.;

B.      Granting injunctive relief, including a preliminary injunction and permanent injunction to prevent IPVM from engaging in all ongoing and future actual and threatened acts of false description and false representation;

C.      Ordering IPVM to pay damages to X.Labs for all losses and injuries and unjust enrichment, including compensatory damages according to proof and disgorgement of IPVM's profits and/or other unjust enrichment in an amount to be determined at trial;

D.      Awarding punitive damages against IPVM sufficient to punish IPVM for its willful misconduct as alleged herein;

E.      Awarding to X.Labs its reasonable attorneys' fees and costs incurred in this matter, together with pre-judgment and post-judgment interest and costs as fixed by the Court; and

F.      For any and all other relief in accordance with proof or which is equitable and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 and Central District of California Local Rule 38-1, X.Labs demands a trial by jury on all issues so triable.

COMPLAINT                                              49

1    Dated:  May 4, 2020                WILSON SONSINI GOODRICH & ROSATI
2                                       Professional Corporation

3
                                        By: */s/ Edward G. Poplawski*
4                                            Edward G. Poplawski
                                             Lisa D. Zang
5
                                        Attorneys for Plaintiff
6                                       Royal Holdings Technologies Corp.
                                        d/b/a X.Labs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                         50