EDWARD G. POPLAWSKI, State Bar No. 113590
epoplawski@wsgr.com
LISA D. ZANG, State Bar No. 294493
lzang@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071-2027
Telephone:  (323) 210-2900
Facsimile:  (866) 974-7329

STEFFEN N. JOHNSON (*pro hac vice* application pending)
sjohnson@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street NW, Fifth Floor
Washington, D.C. 20006
Telephone:  (202) 973-8800
Facsimile:  (202) 973-8899

Attorneys for Plaintiff
Royal Holdings Technologies Corp. d/b/a X.Labs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **ROYAL HOLDINGS TECHNOLOGIES CORP. D/B/A X.LABS**, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>**IP VIDEO MARKET INFO INC.**, a Hawaii corporation,<br><br>Defendant. | Case No. 2:20-cv-04093-SB-PLAx<br><br>**PLAINTIFF ROYAL HOLDINGS TECHNOLOGIES CORP. D/B/A X.LABS' OPPOSITION TO DEFENDANT IP VIDEO MARKET INFO INC.'S SPECIAL MOTION TO STRIKE AMENDED COMPLAINT AND MOTION TO DISMISS**<br><br>Honorable Stanley Blumenfeld Jr.<br>Courtroom 6C<br><br>Hearing: Feb. 22, 2021 (8:30 a.m.) |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................... 1

II.   STATEMENT OF FACTS .................................................................... 5

III.   GOVERNING LEGAL FRAMEWORK ........................................... 8

    A.   Motions to strike under Cal. Code of Civil Proc. Section 425.16 ........ 8

    B.   Motions to dismiss under Fed. R. Civ. P. 12(b)(6) .............................. 9

    C.   First Amendment standards ................................................................. 9

IV.   ARGUMENT ......................................................................................... 9

    A.   IPVM has failed to show that its statements rise to the level of speech that warrants SLAPP protection ............................................. 12

    B.   X.Labs' claims are sufficiently pled to demonstrate at least the requisite probability of prevailing ...................................................... 13

        1.   Under *Unelko*'s first prong, the general tenor of IPVM's articles is serious and factual. .................................................... 13

        2.   Under *Unelko*'s second prong, IPVM's articles do not use figurative or hyperbolic language that negates the impression that its assertions were factual. ............................. 15

        3.   Under *Unelko*'s third prong, IPVM's statements are sufficiently factual to be proven true or false. .......................... 17

            a.   IPVM's statements regarding the Feevr system's alleged inaccuracy and FLIR ONE Pro component ....... 17

            b.   IPVM's statement regarding X.Labs' marketing .......... 22

            c.   IPVM's statements that the Feevr system runs afoul of the FLIR SDK agreement and FDA regulations ........ 23

    C.   X.Labs' remaining state law claims are adequately pled ................... 24

        1.   Intentional interference with contractual relations ................... 24

2.   Intentional and negligent interference with prospective
     economic relations ................................................................25

3.   Trade libel ..............................................................................26

4.   California unfair competition and false description and false
     representation ........................................................................27

D.   X.Labs' federal Lanham Act claim is adequately pled......................28

V.   CONCLUSION ...................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arakelian v. Mercedes-Benz USA, LLC*,
  2018 WL 6422649 (C.D. Cal. June 4, 2018) ..................................................27

*Ariix, LLC v. NutriSearch Corp.*,
  2018 WL 1456928 (N.D. Cal. Aug. 2, 2019)..................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 9

*Cochran v. NYP Holdings, Inc.*,
  58 F. Supp. 2d 1113 (C.D. Cal. 1998),
  *aff'd*, 210 F.3d 1036 (9th Cir. 2000) ..............................................................21

*Consumer Justice Ctr. v. Trimedica Int'l, Inc.*,
  107 Cal. App. .4th 595, 601 (2003)................................................................12

*Elec. Frontier Found. v. Glob. Equity Mgmt. (SA) Pty Ltd*,
  290 F. Supp. 3d 923 (N.D. Cal. 2017) ..........................................................26

*GOLO, LLC v. Higher Health Network, LLC*,
  2019 WL 446251 (S.D. Cal. Feb. 5, 2019) ....................................................12

*Harte-Hanks Commc'ns v. Connaughton*,
  491 U.S. 657 (1989) ..................................................................................11, 21

*Jack Russell Terrier Network v. Am. Kennel Club, Inc.*,
  407 F.3d 1027 (9th Cir. 2005)........................................................................28

*Joint Stock Co. v. Riviera Travel & Tours, Inc.*,
  2014 WL 2889756 (C.D. Cal. June 25, 2014) ...............................................27

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020) .............................................................................. 1

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ........................................................................................28

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000)....................................................................9

*Makaeff v. Trump Univ., LLC*,
    715 F.3d 254 (9th Cir. 2013)......................................................................1

*Milkovich v. Lorain Cnty. Journal*,
    497 U.S. 1 (1990) ................................................... 4-5, 9-10, 17,
    21, 23, 30

*Navellier v. Sletten*,
    29 Cal. 4th 82 (2002)................................................................................8

*Nolan Miller Inc. v. Hees*,
    2018 WL 3533392 (C.D. Cal. July 20, 2018) ...........................................25

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
    151 Cal. App. 4th 688 (2007)............................... 2, 8-9, 11, 15, 21-22

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995)................................ 10, 13, 16-17, 19

*Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*,
    890 F.3d 828 (9th Cir. 2018)......................................................................9

*Resolute Forest Prods. v. Greenpeace Int'l*,
    2019 WL 281370 (N.D. Cal. Jan. 22, 2019) .............................................11

*Rockwell Collins, Inc. v. Wallace*,
    2017 WL 5502775 (C.D. Cal. Nov. 10, 2017) ...........................................9

*Shwarz v. United States*,
    234 F.3d 428 (9th Cir. 2000)......................................................................9

*Silicon Knights v. Crystal Dynamics*,
    983 F. Supp. 1303 (N.D. Cal. 1997) .........................................................25

*Slaughter v. Friedman*,
    32 Cal. 3d 149 (1982).....................................................................11, 15

*Suzuki Motor Corp. v. Consumers Union of United States, Inc.*,
    330 F.3d 1110 (9th Cir. 2003)............................................4, 11, 21

*Trindade v. Reach Media Group, LLC*,
    2013 WL 3977034 (N.D. Cal. July 31, 2013)............................................13

*Underwager v. Channel 9 Austl.*,
    69 F.3d 361 (9th Cir. 1995) ........................................................... 21

*Unelko Corp. v. Rooney*,
    912 F.2d 1049 (9th Cir. 1990) ................................... 2, 10-11, 16-18

*Wilbanks v. Wolk*,
    121 Cal. App. 4th 883 (2004) ........................................... 11, 14-15

## STATUTES

15 U.S.C. § 1125(a)(1)(B) ................................................................ 29

Cal. Code of Civ. Proc. § 425.16 ................................................ 1, 8, 13

## RULES

FED. R. CIV. P. 8(a)(2) ..................................................................... 9

FED. R. CIV. P. 12 ................................................................. 1, 8-9, 21

FED. R. CIV. P. 56 ........................................................................... 1

L.R. 11-5.2 ..................................................................................... 1

## MISCELLANEOUS

5B C. Wright & A. Miller, Federal Practice and Procedure
    § 1356 (3d ed. 2004) ................................................................. 9

U.S. Const. amend. I ................................................................ 1, 5, 9, 11

*Webster's New International Dictionary* (3d ed. 1986) ........................... 18

## I.    INTRODUCTION

Plaintiff X.Labs' Amended Complaint ("1AC" or "Complaint") alleges that Defendant IPVM—a product reviewer that touts its technological prowess to paying subscribers—knowingly made false, deceptive, disparaging, and defamatory statements about X.Labs and its proprietary product, the Feevr thermal imaging and software system.  That system uses custom artificial intelligence ("AI")-based software, which is integrated into a mobile device connected to a thermal imaging camera, to focus the camera on the area of the human forehead directly correlated to the temporal artery and obtain a more accurate preliminary skin temperature reading than one can obtain with off-the-shelf software.  1AC ¶¶ 2, 29.  Yet without examining the system, IPVM knowingly published articles falsely stating that X.Labs' product and advertising were fundamentally inaccurate and endangered the public.

IPVM's anti-SLAPP motion to dismiss ("MTD")[1] rests on the premise that the Complaint challenges statements of "opinion" that either are "based on accurate, disclosed facts" or "are not capable of being proved true," and thus are protected by the First Amendment.  MTD 2, 19.  That premise is false.

Take, for example, the opening statements in IPVM's April 14, 2020, article:

> Beware of "Feevr".  The company is marketing a "Feevr" solution that fundamentally lacks accuracy for its use, as its thermal provider FLIR has said and IPVM testing has shown.

1AC, Ex. 8, at 135.[2]  Broken down, this short passage itself makes three statements:

---

[1] X.Labs objects to application of the California anti-SLAPP statute (Cal. Civ. Code Proc. § 425.16) as conflicting with the Federal Rules of Civil Procedure and reserves the right to challenge its applicability in federal court.  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 273 (9th Cir. 2013) (Kozinski, J., concurring) (the act "is quintessentially procedural" and "has no application in federal court."); *La Liberte v. Reid*, 966 F.3d 79, 83 (2d Cir. 2020) (the act "increases a plaintiff's burden to overcome pretrial dismissal, and thus conflicts with Federal Rules of Civil Procedure 12 and 56.").

[2] Pursuant to L.R. 11-5.2, our citations of exhibits to the Complaint refer to the page numbers appended to the bottom of each page, as the ECF "Page ID" numbers cited by IPVM do not appear on all exhibit pages.  *See, e.g.*, 1AC, Ex. 16.

The "'Feevr' solution … fundamentally lacks accuracy for its use."

"FLIR has said" the "Feevr solution … fundamentally lacks accuracy for its use."

"IPVM testing has shown" the "Feevr solution … fundamentally lacks accuracy for its use."

Similarly, IPVM's March 31, 2020, article stated that the Feevr system was "highly likely" to produce "false positives and negatives." *Id.*, Ex. 7, at 128.  IPVM also falsely stated or implied that X.Labs' product was unsafe, backed by misleading ads, and lacked needed governmental approval. *Id.*, Ex. 8, at 135, 138-39, 141.

Contrary to IPVM's repeated assertions, these statements are not "opinions"; all of them are "capable of being proven true or false." *E.g.*, MTD 20.  Whether a product that measures skin temperature "fundamentally lacks accuracy" can be verified. *See Unelko Corp. v. Rooney*, 912 F.2d 1049, 1055 (9th Cir. 1990) ("The statement 'It didn't work' is essentially factual.").  Indeed, in responding to X.Labs' criticism of its April 14 article, IPVM declared: "The facts remain." 1AC, Ex. 8, at 138.

Further, that IPVM felt compelled to back its assertions with (false) claims that it had "test[ed]" Feevr's system—when in truth it refused X.Labs' offer to provide it with an actual product specimen to evaluate (1AC ¶¶ 6, 48, 53, 60, 68, 78, 81)—belies the notion that it was "opining" or engaging in "rhetorical hyperbole." MTD 10, 20.  IPVM "holds itself out to its subscribers as having specialized knowledge" in the relevant product market, *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 706 (2007), and those subscribers would have little interest in its supposedly expert technical reviews if the reviews did not purport to be substantiated by fact.  Moreover, X.Labs' Complaint alleges in detail that, as third-party expert testing confirms, IPVM's factual assertions that the Feevr system is inaccurate and unsafe are demonstrably false.  1AC ¶¶ 7-8, 84-109.

IPVM cannot dodge liability by claiming that its statements were "not 'of and concerning' Plaintiff" because they focused on just one of the Feevr system's

components—the FLIR ONE Pro camera.  MTD 2; *see* MTD 10 (IPVM "report[ed] on the limits of the FLIR One Pro and, therefore, the Feevr system that relies on it"). As IPVM admits, it did "testing" only "of *the FLIR One Pro*," but its article stated "that the Feevr *system* 'fundamentally lacks accuracy for its use.'"  MTD 4 (emphasis added).  IPVM thus disparaged the system *as a whole*, not just the FLIR ONE Pro.  And unlike FLIR's off-the shelf technology, X.Labs uses proprietary AI-based software to better focus the associated camera, enhancing its ability to assess skin temperature.  1AC ¶ 29.  IPVM's statement that the Feevr system "fundamentally lacks accuracy" is like purporting to review a camera by looking only at the specs of a stock manual lens, when the camera in fact uses a powerful custom auto-focus lens.

Remarkably, when quoting its April 14 article, IPVM now adds bracketed text suggesting that IPVM stated that it tested *only* the FLIR ONE Pro camera.  MTD 6 (quoting IPVM's April 14 article as stating that "Feevr 'fundamentally lacks accuracy for its use, as its thermal provider FLIR has said and IPVM testing [*of the FLIR ONE Pro*] has shown'") (bracketed language added by IPVM; emphasis ours).  But the challenged statement contained no such qualification: "The company is marketing a 'Feevr' solution that fundamentally lacks accuracy for its use, as its thermal provider FLIR has said and IPVM testing has shown."  1AC, Ex. 8, at 136.  IPVM's revision is tantamount to a confession that the statement, as published, was false.

Nor, as the Complaint explains, can there be any question that IPVM knew this.  Before IPVM published its April 14 article, it published an "Update" to its March 31 article acknowledging that the Feevr system "doesn't use the flir SDK [Software Development Kit]" that FLIR itself markets for use with its ONE Pro camera; X.Labs uses its "own custom app" that "performs screening functions" to "detect[] faces in the field of view" and identify the relevant region.  1AC, Ex. 7, at 131; *accord* 1AC ¶ 29.  Thus, IPVM knew that the Feevr system's proprietary software was distinct from FLIR's when IPVM falsely stated—without bothering to test X.Labs' custom software or examine its algorithms—that the Feevr system

"fundamentally lacks accuracy for its use." 1AC, Ex. 8, at 135. And under binding precedent, where a defendant had "knowledge that its tests were potentially flawed" but "failed reasonably to investigate," such facts "could lead a jury to conclude by clear and convincing evidence that [the defendant] was aware of the falsity of its [product] report" but "purposefully avoided the truth." *Suzuki Motor Corp. v. Consumers Union of United States, Inc.*, 330 F.3d 1110, 1139, 1136 (9th Cir. 2003).

Indeed, another so-called "Update" to the March 31 article states that, when IPVM asked FLIR about X.Labs' system, "FLIR responded saying, 'We don't have clarity on how they've developed their product,'" noting only that FLIR *itself* "ha[s] a different set of cameras that we market for elevated skin temperature screening." 1AC, Ex. 7, at 131. That is a far cry from stating, as IPVM put it in the next article: "FLIR has said" the "Feevr solution . . . fundamentally lacks accuracy for its use." 1AC, Ex. 8, at 135. And X.Labs has alleged, on information and belief, that IPVM had economic reasons to disparage the Feevr system because FLIR and other competitors are IPVM subscribers who sell competing (but more expensive) cameras. 1AC ¶¶ 45, 232, 250; *see also* 1AC, Ex. 10, at 513 ("FLIR wants to sell 20-50K cameras for medical-grade fever detection. [X.Labs is] selling a 2K version."). In fact, FLIR's own website promotes its more expensive cameras and "smart cameras" for measuring elevated skin temperature. 1AC, Ex. 15, at 179.

IPVM cannot escape liability by asserting that it disclosed the factual basis for its claims. As the Supreme Court held in the leading decision in this area, which IPVM barely mentions: "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich v. Lorain Cnty. Journal*, 497 U.S. 1, 18 (1990). That is the situation here. As the Complaint alleges (1AC ¶¶ 2, 52, 72), IPVM did *not* disclose to its subscribers facts that were critical to assessing the truth of its claims that the Feevr system was fundamentally inaccurate—the facts about X.Labs' proprietary AI-based software,

which enables the Feevr system to reach accurate results.  As independent expert testing shows, moreover, X.Labs' product does not produce high "false positives and negatives"; it is accurate and reliable for its intended purpose of screening people and detecting elevated forehead temperatures. *Id.* ¶¶ 84–109.  In fact, the data show that, across all subjects and trials, the average measurements recorded by Feevr units were within 1°C of like measurements recorded by an FDA-approved non-contact thermometer and a thermal camera that, FLIR admits, has the requisite resolution for conducting elevated skin temperature screening. *Id.* ¶¶ 90–109.

Once these points come into focus, it is plain that this case should proceed.  It is black-letter law that the First Amendment does not permit defendants to use the label "opinion" to shield themselves from liability for statements that either themselves are provably false or reasonably imply underlying facts that are "sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21.  If "a reasonable factfinder could conclude that the [challenged] statements … imply [a false] assertion" of fact, that is "dispositive" and the claim can proceed. *Id.*

IPVM's challenges to X.Labs' other claims are equally unconvincing.  X.Labs' interference with contractual and prospective economic relations claims adequately plead knowledge and intent.  X.Labs' trade libel claim adequately alleges special damages by identifying specific customers and transactions lost due to IPVM's articles.  X.Labs' unfair competition and false description and representation claims allege in detail the economic motivation that IPVM has to publish its false and defamatory statements, explaining that such statements benefit its subscribers and members, including FLIR, who compete with X.Labs.  This is sufficient under California law and the Lanham Act—and as to the latter, IPVM relies on a standard overruled by the Supreme Court in 2014.

## II.    STATEMENT OF FACTS

X.Labs launched its proprietary Feevr system on March 25, 2020, against the backdrop of the ongoing worldwide COVID-19 pandemic.  1AC ¶¶ 17-22.  The

Feevr system is a rapid thermal screening system that includes X.Labs' proprietary AI-based mobile app integrated into a mobile device connected to a thermal imaging camera, such as the FLIR ONE Pro.  *Id.* ¶¶ 23-38.

The Feevr system performs a preliminary scan to detect individuals in a crowd who have elevated forehead skin temperatures.  *Id.* ¶¶ 23, 29, 31-37.  In particular, the Feevr system uses AI-based logical reasoning to tailor the area of focus for skin temperature measurement to a discrete region of the forehead directly correlated to the temporal artery, detect the skin temperature there, and disregard other temperatures in the field of view.  *Id.* ¶¶ 4, 29, 77.  When an individual's skin temperature exceeds a predetermined threshold, the system automatically displays a visual alert to the user for secondary screening of the individual.  *Id.* ¶¶ 4, 31-37; *id.*, Ex. 1.

The Feevr system does not use the software development kit ("SDK") that FLIR markets for use with the FLIR ONE Pro.  *Id.* ¶¶ 25, 52.  The FLIR SDK is a different piece of software and is rudimentary in comparison to the Feevr system's proprietary AI-based software.  *Id.* ¶¶ 49, 59, 77, 84.  In fact, the FLIR SDK does not perform any of the functions of the Feevr system's custom app.  *Id.* ¶ 82.

IPVM knew that the Feevr system consists of not only a thermal imaging camera, but also X.Labs' proprietary AI-based software—and not the FLIR SDK—when it published each of its false and defamatory statements against X.Labs and its Feevr system.  *Id.* ¶¶ 2, 80, 82.  As a product reviewer that holds itself out as an expert in the technological assessment of AI-based thermal systems for forehead skin temperature measurement, IPVM also knew that testing a unit of the actual Feevr system—and not just its camera component—was critical to accurately and reliably evaluating the accuracy of the Feevr system.  *Id.* ¶¶ 2, 39-44, 80; *id.*, Ex. 4.

X.Labs offered to provide IPVM with a specimen of the Feevr system for evaluation.  *Id.* ¶¶ 6, 48, 53, 60, 68, 78, 81.  If IPVM had conducted the requisite testing and analysis, IPVM would have known that the Feevr system is in fact fundamentally accurate and reliable for its intended purpose of screening and detecting

individuals with elevated forehead skin temperature and does not result in high "false positives and negatives." *Id.* ¶¶ 7, 83, 110.  In fact, actual testing of the Feevr system by an expert in the relevant field of medical and health-related devices (Dr. Paul L. Briant, PhD, of Exponent, Inc.) corroborates its accuracy. *Id.* ¶¶ 7-8, 84-109.

IPVM, however, declined X.Labs' offer and proceeded to publish its false and defamatory statements, including that "IPVM testing has shown" that the "'Feevr' solution" "fundamentally lacks accuracy for its use" and that "false positives and negatives are highly likely" when using that system. *Id.* ¶¶ 6, 46-79, 81; *id.*, Ex. 7-11.  In publishing these statements, IPVM chose to cherry-pick from FLIR's statements regarding the FLIR ONE Pro camera and X.Labs' marketing materials for the Feevr system. *Id.* ¶¶ 2, 47, 53, 68, 74, 78, 81.  Further, IPVM tested only the FLIR ONE Pro component of the Feevr system. *Id.* ¶ 47, 68, 81; *id.*, Ex. 8, at 135.

Although X.Labs called these false statements and omissions to IPVM's attention before IPVM published its April 14 article and again on April 22, 2020, IPVM refused to retract its false statements or to clarify to its subscribers the falsity of its statements and omissions. *Id.* ¶¶ 116-17; *id.*, Ex. 8, at 137 (April 14 article stating that X.Labs "responded to IPVM's accuracy concerns"), 138 (April 14 article stating that X.Labs "sen[t] us a list of objections.  We updated our original report [i.e., March 31 article] with their feedback"); *id.*, Ex. 16 (cease-and-desist letter), at 181 ("The Feevr system includes an AI-based mobile app"), 182 ("[T]he article then acknowledges X.Labs' statement that 'Feevr doesn't use the FLIR SDK.  Feevr uses it's [sic] own custom app with a FLIR camera.' . . . in connection with publishing this article, IPVM declined X.Labs' offer to provide a unit of its Feevr system to IPVM for analysis."), 184 (demanding that IPVM "[e]xplain IPVM's failure to acquire and use the Feevr system, including the mobile app, in connection with any testing or assessment of the Feevr system").

Many X.Labs customers have cited IPVM's publications in terminating or suspending their sales agreements with X.Labs.  1AC ¶ 111.  For example, on April

14, 2020, X.Labs lost $750,000 in revenue when an American social media corpo-ration and a Japanese e-commerce company each suspended their orders of the Feevr system based on IPVM's March 31 article.  *Id.*  Further, many other customers—including Exxon Mobil, BP America, U.S. Foods, Coca-Cola, Flex-N-Gate, Major League Baseball, and a Japanese e-commerce company—have raised concerns about the Feevr system based on the IPVM articles.  *Id.* ¶ 112.  Many of X.Labs' prospec-tive customers—including wework, the New Mexico Government, and Westrock—have declined to enter into contracts to purchase the Feevr system due to the articles.  *Id.* ¶ 113.  X.Labs' supplier, FLIR, suspended its 2018 Product Supply Agreement ("PSA") with X.Labs for a period of time and later gave notice of intent to terminate its 2020 PSA with X.Labs due to IPVM's defamatory statements.  *Id.* ¶ 114.  X.Labs' development partner, Fusus, similarly withdrew from its software and integration agreement with X.Labs for the Feevr system because of the articles.  *Id.*

## III.   GOVERNING LEGAL FRAMEWORK

### A.   Motions to strike under Cal. Code of Civil Proc. Section 425.16

A motion to strike under Cal. Code of Civil Proc. § 425.16 involves a two-step analysis: first, determining whether the defendant can show that the challenged claim arises from protected activity within the meaning of the statute; and second, if the defendant can do so, determining whether the plaintiff can establish a "probabil-ity" of prevailing on the merits.  *Overstock.com*, 151 Cal. App. 4th at 699.

"Precisely because the statute (1) permits early intervention in lawsuits alleg-ing unmeritorious causes of action that implicate free speech concerns, and (2) limits opportunity to conduct discovery, *the plaintiff's burden of establishing a probability of prevailing is not high*."  *Id.* (emphasis added).  Accordingly, "[o]nly a cause of action that lacks 'even minimal merit' constitutes a SLAPP."  *Id.* at 700 (quoting *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002)).

In federal court, a Section 425.16 motion based on alleged deficiencies in the

complaint is treated as a Rule 12(b)(6) motion.  *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018) (citation omitted).

## B.   Motions to dismiss under Fed. R. Civ. P. 12(b)(6)

To satisfy Rule 12(b)(6), a claim need only offer a "short and plain statement" "showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  "With that liberal pleading standard, the purpose of a motion under Rule 12(b)(6) is 'to test the formal sufficiency of the statement of the claim for relief.'"  *Rockwell Collins, Inc. v. Wallace*, 2017 WL 5502775, at *1 (C.D. Cal. Nov. 10, 2017) (citing 5B C. Wright & A. Miller, Federal Practice and Procedure § 1356, p. 354 (3d ed. 2004)).  This statement "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In considering a motion under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint, as well as all reasonable inferences that may be drawn from such allegations.  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1150 n.2 (9th Cir. 2000).  Such allegations must be construed in the light most favorable to the non-moving party.  *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

## C.   First Amendment standards

Several First Amendment standards are particularly relevant here.

1. Although IPVM barely mentions *Milkovich*, the leading Supreme Court defamation case on the difference between facts and opinions, that decision is directly on point, and California courts routinely apply it.  *E.g.*, *Overstock.com*, 151 Cal. App. 4th at 699.  The plaintiff in *Milkovich*, a high school coach, sued a newspaper for implying that he committed perjury at an athletic association hearing.  497 U.S. at 3–7.  The newspaper said its statements were opinions, and thus protected speech.  The Court disagreed in reasoning directly applicable here.

First, the Court rejected any "wholesale defamation exemption for anything

1   that might be labeled 'opinion.'"  *Id*. at 18.  As the Court held, even "expressions of

2   'opinion' may often imply an assertion of objective fact" that is actionable.  *Id*. Thus,

3   courts must assess whether statements are "sufficiently factual to be susceptible of

4   being proved true or false"—"objectively verifiable" as opposed to "subjective as-

5   sertion[s]."  *Id*. at 21.  If "a reasonable factfinder could conclude that the [challenged]

6   statements . . . imply [a false] assertion" of fact, that is "dispositive."  *Id*.

    In finding this standard satisfied, the Court noted that the subject statements
7
    were "not the sort of loose, figurative, or hyperbolic language which would negate
8
    the impression that the writer was seriously maintaining that petitioner committed
9
    the crime of perjury," and that the article's "general tenor" did not "negate th[e]
10
    impression" either.  *Id*. at 22 (citation and quotation omitted).  Thus, "the threshold
11
    question in defamation suits is not whether a statement 'might be labeled "opinion,"'
12
    but rather whether a reasonable factfinder could conclude that the statement 'implies
13
    an assertion of objective fact.'"  *Unelko*, 912 F.2d at 1053 (citation omitted).
14

    Second, the Court in *Milkovich* confirmed that a statement couched as opinion
15
    "may imply a false assertion of fact" "[e]ven if the speaker states the facts upon
16
    which he bases his opinion, if those facts are either incorrect or incomplete, or if his
17
    assessment of them is erroneous."  *Id*. at 18.
18

    2.   In *Unelko*, the Ninth Circuit "adopted a three-part test" for reviewing
19
    whether, under *Milkovich*, "'a reasonable factfinder could conclude that the con-
20
    tested statement 'implies an assertion of objective fact'": "(1) whether the general
21
    tenor of the entire work negates the impression that the defendant was asserting an
22
    objective fact, (2) whether the defendant used figurative or hyperbolic language that
23
    negates that impression, and (3) whether the statement in question is susceptible of
24
    being proved true or false."  *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.
25
    1995) (quoting *Unelko*, 912 F.2d at 1053 (quoting *Milkovich*, 497 U.S. at 19)).
26

    3.   In addition, the "deliberate decision not to acquire knowledge of facts that
27
    might confirm the probable falsity of [a challenged statement]" is "'unmistakably'
28

sufficient to support a finding of actual malice." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 692-93 (1989).  Thus, where the defendant is a product reviewer and had "knowledge that its tests were potentially flawed" but "failed reasonably to investigate," such facts "could lead a jury to conclude by clear and convincing evidence that [the defendant] was aware of the falsity of its [product] report." *Suzuki*, 330 F.3d at 1139.  Put another way, if there are "indications that the [defendant's product] rating rested on questionable data and suspect methodological premises," but the defendant "took no steps to engage in further investigation," such facts "reinforce[e] the inference of purposeful avoidance" of the truth.  *Id*.

4.  "[A] statement is more likely to be viewed as one of fact, as opposed to opinion, when the speaker might reasonably be perceived as an expert or authority on the topic of the statement" (*Resolute Forest Prods. v. Greenpeace Int'l*, 2019 WL 281370, at *6 (N.D. Cal. Jan. 22, 2019) (citing *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 904 (2004); *Slaughter v. Friedman*, 32 Cal. 3d 149, 154 (1982))), such as where the defendant "holds itself out to its subscribers as having specialized knowledge" in the relevant field.  *Overstock.com*, 151 Cal. App. 4th at 706.

5.  Finally, "claims for product disparagement, or 'trade libel,' and for tortious interference with business relationships . . . are subject to the same first amendment requirements that govern actions for defamation."  *Unelko*, 912 F.2d at 1057-58.

## IV.  ARGUMENT

IPVM's motion fails at each and every step of the required analysis.  As to the defamation claim, IPVM cannot demonstrate that its statements qualify as protected speech on an issue of public interest in a public forum, as they are directed to the technical capabilities of a single product and are made on a website that is generally accessible only to paid subscribers.  Further, IPVM's statements plainly state or imply provably false assertions of fact, and thus are actionable.  Finally, X.Labs has adequately pled its remaining claims under California and federal law.

### A.  IPVM has failed to show that its statements rise to the level of speech that warrants SLAPP protection.

At the first step of the anti-SLAPP analysis, IPVM says its statements qualify as protected speech because they were made on its website and relate to "marketing and sale of devices claiming to be useful in detecting and preventing the spread of a global pandemic." MTD 8-10.  That is a far cry from the sort of statements on issues of public interest in public fora that courts deem protected by the anti-SLAPP law.

First, IPVM's statements are directed to specific technical capabilities of a specific product—the Feevr system—not to current affairs, trends, or even the wider issue of the effectiveness of AI-based thermal systems for detecting elevated skin temperature generally.  1AC ¶¶ 46-79.  Such statements do not warrant anti-SLAPP protection.  For example, *GOLO, LLC v. Higher Health Network, LLC*, 2019 WL 446251, at *13-14 (S.D. Cal. Feb. 5, 2019), a false advertising case where the plaintiff challenged a review of the defendant's product, held that the defendants failed to present a prima facie case that the suit challenged acts in furtherance of their free speech rights because they had "not shown that the review dealt with more general issues of weight loss and health, rather than just a review of [a] specific product." Similarly, California precedent has rejected applying anti-SLAPP rules to litigation challenging "commercial speech about the specific properties and efficacy of a particular [herbal supplement] product," rather than "herbal supplements in general," stating: "If we were to accept [defendant's] argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute." *Consumer Justice Ctr. v. Trimedica Int'l, Inc.*, 107 Cal. App. .4th 595, 601 (2003).

Second, even assuming that IPVM, from time to time, makes some content available to non-subscribers, it is fundamentally a paid membership and subscriber-based business whose readers pay fees for access to specialized services.  1AC ¶¶ 2, 10, 41-44; *Id.*, Ex. 4; MTD 3.  As X.Labs has alleged, a subscription is required to

access the May 20 article (1AC ¶ 79), and IPVM has, on information and belief, merely made the March 31, April 14, April 17, and May 7 articles available to non-members for a period of time. *Id.* ¶ 43. IPVM's statements were thus not "made in a place open to the public or a public forum." Cal. Code of Civ. Proc. § 425.16(e)(3).

In sum, IPVM's statements do not qualify as protected activity under the anti-SLAPP statute because they are directed to a limited audience of its subscribers and members and specifically target X.Labs and its Feevr system. *See Trindade v. Reach Media Group, LLC*, 2013 WL 3977034, at *10-13 (N.D. Cal. July 31, 2013) (denying motion to strike on grounds that "a matter of concern to the speaker and a relatively small specific audience is not a matter of public interest"). Accordingly, IPVM fails to meet its initial burden to establish that the anti-SLAPP statute can be used to challenge X.Labs' claims. The Court's analysis should end here.

### B. X.Labs' claims are sufficiently pled to demonstrate at least the requisite probability of prevailing.

Even if the Court reaches the second anti-SLAPP step, IPVM's motion should be denied. In assessing whether "'a reasonable factfinder could conclude that [a] contested statement 'implies an assertion of objective fact,'" Ninth Circuit precedent asks "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Partington*, 56 F.3d at 1153 (citations omitted). Each factor confirms that this case should proceed.

### 1. Under *Unelko*'s first prong, the general tenor of IPVM's articles is serious and factual.

First, the "general tenor" of the challenged articles, read as a whole, is serious and factual. *See* 1AC, Ex. 7-11. In responding to X.Labs' criticism of its April 14 article, IPVM itself defended its product review as factual. *Id.*, Ex. 8, at 138 ("The facts remain"). Further, IPVM backed its assertions with (false) claims that it had

1    "test[ed]" the product—claims that self-evidently were designed to reassure IPVM's

2    subscribers that its product review was objective and fact-based.  *Id.*, Ex. 8, at 135.

3        That the challenged articles are meant to convey serious objective information

4    is especially clear given that IPVM holds itself out as an expert product reviewer.

5    IPVM repeatedly attempts to portray itself as a group of "reporters" engaged in "le-

6    gitimate reporting on matters of urgent public concern."  *E.g.*, MTD 1-2.  But IPVM

7    is not *The New York Times* or even *60 Minutes*.  It is a product reviewer that touts

8    itself as a technological "expert," as a purveyor of "the best reporting, testing and

9    training," and as "dedicated to [providing] independent and objective information"

10   —i.e., the facts—to paying subscribers.  *Id.* ¶¶ 2, 6, 40-44, 80, 110; *id.*, Ex. 4, at 120.

11       Indeed, IPVM holds itself out as "the world's leading authority on video sur-

12   veillance, delivering unmatched reporting, research, and test results," and as "[t]he

13   only independent industry testing service (700+) providing critical analysis and

14   rankings on leading products" with "dedicated specialists covering cameras" and

15   "video analytics."  *Id.*, Ex. 4 at 120.  IPVM purports to be "the most comprehensive

16   source for video surveillance education," and claims its website is "the most read

17   and discussed resource by leading executives, designers, and technologists in the

18   security industry, ranging from Fortune 100 companies to government security di-

19   rectors and the largest technology companies in the world"—a site routinely "cited

20   by global publications" like *The Wall Street Journal* and *New York Times*.  *Id.*  IPVM

21   further boasts of special expertise in the technological assessment of AI-based ther-

22   mal systems for detecting elevated skin temperature.  1AC ¶¶ 40, 80, 110.  Even

23   IPVM's motion calls its staff "experts on video surveillance and related technolo-

24   gies" who provide "independent, objective information" to "subscribers," and whose

25   work is relied on "by major publications, law enforcement, and Congress."  MTD 3.

26       As numerous California courts have noted, statements "that, if made by a lay-

27   person, might constitute opinion may be understood as being based on fact if made

28   by someone with specialized knowledge of the industry."  *Wilbanks*, 121 Cal. App.

4th at 904.  In *Slaughter*, for example, the California Supreme Court observed that, "[a]lthough accusations of 'excessive' fees or 'unnecessary' work when made by laymen might indeed constitute mere opinion, similar accusations by professional dental plan administrators carry a ring of authenticity and reasonably might be understood as being based on fact."  32 Cal. 3d 149, 154 (1982).

In this regard, IPVM is strikingly similar to the defendant in *Overstock.com*, where an internet-based sales company, Overstock.com, alleged defamation against a firm that published subscriber-based analytic reports calling Overstock.com's financial statements "misleading."  151 Cal. App. 4th at 703.  The California Court of Appeal affirmed the dismissal of the defendant's anti-SLAPP motion, noting that the defendant touted its "independent and objective analysis" as a specialist:

> Gradient characterizes its reports, alerts and bulletins as presenting the firm's 'unbiased, independent and objective analysis of a company's earnings quality' and tells subscribers who ask that they are prepared by professional certified public accountants and financial analysts.  The tone and content is serious, and a typical subscriber would take the materials seriously. . . . Moreover, Gradient holds itself out to its subscribers as having specialized knowledge in the areas of financial accounting and issues of earnings quality.  Its business was built around developing reader confidence to rely on its opinions as reflecting the truth about Overstock and other frequently targeted companies.

151 Cal. App. 4th at 706.  IPVM likewise describes its team as "specialists" providing "expert reports" containing "independent and objective information."  1AC, Ex. 4, at 120-21.  Thus, IPVM "clearly expected readers to rely on [its] opinions as reflecting the truth" (*Wilbanks*, 121 Cal. App. 4th at 904), and it should be called to account for the falsity of what IPVM itself earlier called "facts."  *Id*., Ex. 8, at 138.

### 2. Under *Unelko*'s second prong, IPVM's articles do not use figurative or hyperbolic language that negates the impression that its assertions were factual.

*Unelko*'s second prong, which asks whether IPVM "used figurative or hyperbolic language that negate[d] th[e] impression" that it "was asserting an objective

fact" (*Partington*, 56 F.3d at 1153), confirms that IPVM's motion should be denied.

IPVM cites just two purported uses of such language:  its "Beware of Feevr" headline, and its "statement that a test subject appeared to be suffering from 'hypo-thermia.'"  MTD 18.  But "Beware" is a classic warning meaning "to be on one's guard," https://www.merriam-webster.com/dictionary/beware, and the fact that it was meant to be taken seriously is confirmed by both IPVM's use of bold type and the words that followed: "The company is marketing a 'Feevr' solution that funda-mentally lacks accuracy for its use, as its thermal provider FLIR has said and IPVM testing has shown."  1AC, Ex. 8, at 135.  Indeed, IPVM continues to insist that it was justified in "warn[ing] the public to 'beware' of Feevr."  MTD 18.

IPVM's lone reference to "hypothermia" is plainly part of what is intended to be a serious discussion of the Feevr system's imaging results: "The red box on the right is an alarm on the person who may have a 'feevr' (99° F) but the sharp diver-gence in temperatures is more alarming.  The two people on the left and center with 90-91°F temperatures are evidently dying of hypothermia or inaccuracy in measure-ment.  That's typical for Feevr's demos."  1AC, Ex. 8, at 136 (paragraph break and image omitted).  Nothing about this passage suggests that IPVM was exaggerating; it is most reasonably read as (falsely) describing those images as depicting core *body* temperatures—rather than the lower, normal *skin* temperatures that these results ac-tually depict—as assertions of fact.  1AC ¶ 63; *id.*, Ex. 1, at 113.

IPVM's boasts of objectivity and specialized technical expertise make it still more fanciful to think IPVM's readers would take its statement as merely a "colorful comment."  MTD 18.  And even if the lone reference to hypothermia *were* hyper-bole, one isolated word over several articles (1AC, Exs. 7-11) cannot begin to un-dermine IPVM's damning product reviews, which purport to state "the facts."  1AC, Ex. 8, at 138.  In *Unelko*, for example, the defendant's "presentation, as a whole, was characterized by hyperbole to some extent," but his statement "It didn't work" concerning the product Rain-X was "not couched in loose, figurative, or hyperbolic

language" and thus conveyed that the defendant was "maintaining that Rain-X failed to perform as guaranteed"—a factual assertion.  912 F.2d at 1054.  So too here.

### 3. Under *Unelko*'s third prong, IPVM's statements are sufficiently factual to be proven true or false.

*Unelko*'s third prong, which asks whether IPVM's claims can be "proved true or false" (*Partington*, 56 F.3d at 1153), confirms that each claim here must proceed.

#### a. IPVM's statements regarding the Feevr system's alleged inaccuracy and FLIR ONE Pro component

IPVM's defense of its statements about the FLIR ONE Pro (MTD 10-13) and its defense of several other "remaining challenged statements" (MTD 14-20) are of a piece.  (We address IPVM's claims about FDA approval and X.Labs' marketing below (at 22-24).)  Specifically, IPVM says its "statements about the accuracy of *the Feevr system*" and "the risk it presents to the public" are "opinions" that either are "based on accurate, disclosed facts" or "are not capable of being proven true or false," and that its "reporting on the limits of the *FLIR One Pro*, and *therefore, the Feevr system* that relies on it, is . . . accurate."  MTD 2, 4, 10-12, 14-17, 20 (emphases added).  These points rest on the premise that testing of "the Feevr system" and testing of "the FLIR One Pro" are one and the same thing.  That premise is false.  Further, there can be no serious question that "a reasonable factfinder could conclude that [IPVM's] statements"—none of which are actually couched as "opinion"—either state or "imply a false assertion" of fact, and the "facts" that IPVM supposedly did disclose were "either incorrect or incomplete," and its "assessment of them [was] erroneous."  *Milkovich*, 497 U.S. at 18, 21.

At the outset, it helps to recall what IPVM actually said—that X.Labs "is marketing a 'Feevr' solution that fundamentally lacks accuracy for its use, as its thermal provider FLIR has said and IPVM testing has shown" (1AC, Ex. 8, at 135), and that X.Labs' product is "highly likely" to produce "false positives and negatives" (1AC, Ex. 7, at 128); *see also id.*, Ex. 7, at 130 (citing "problems" with the system and

stating that IPVM was "particularly worried about how accurate [the Feevr system] will be"); 1AC ¶¶ 55, 172. A reasonable jury could plainly view these statements as factual. After all, what's the point of saying one' view is backed by "testing" if not to assure readers that one is serious and not just shooting from the hip?

*Unelko* is instructive. There, the Ninth Circuit held that the statement that the defendant (Andy Rooney of *60 Minutes*) used plaintiff's Rain-X product and "[i]t didn't work" was "objectively verifiable" and thus "capable of being understood as an assertion that the product failed to meet certain objective indicia of effectiveness." 912 F.2d at 1055. As the Court explained, ordinary listeners would take Rooney's statement "[i]t didn't work" as speaking objectively to "the extent to which Rain-X lived up to its bottle's claims," because "'work,' in the sense Rooney used it, means 'to function or operate according to plan or design,' *Webster's New International Dictionary* (3d ed. 1986), a standard capable of objective determination to some extent when applied to a product designed to improve visibility." *Id.* Even if assertions about whether Rain-X "increased [one's] all-around visibility, safety, and driving comfort" could be considered "somewhat subjective," they were "based on factual observations" and "capable of being proved true or false." *Id.* (citation omitted). The same is true of claims that "testing has shown" that the Feevr system "fundamentally lacks accuracy for its use," or is "highly likely" to produce "false" results—particularly coming from an entity that boasts specialized testing expertise.

Nor were IPVM's statements limited to "the FLIR One Pro": Both its claims about "testing," and its claims about accuracy, spoke to the Feevr system as a whole. 1AC, Exs. 7, 8; *id.*, Ex. 9-11. Indeed, the March 31 and April 14 articles were titled "USA's *Feevr Thermal Temperature System* Examined" and "Beware of *Feevr*," respectively (1AC ¶¶ 5, 46, 57; *id.*, Ex. 7, at 126; *id.*, Ex. 8, at 135), and they defined "[t]he Feevr thermal screening system" and the "'Feevr' solution" to include all of its components. *Id.* ¶ 59; *id.*, Ex. 7, at 127; *id.*, Ex. 8, at 135. Thus, there can be no question that IPVM's defamatory statements were "'of and concerning'" X.Labs.

*Contra* MTD 2, 10-13.  As the Complaint alleges, however, IPVM rejected X.Labs'
offer to provide it with a unit of the Feevr system for evaluation (*id.* ¶¶ 6, 46-79, 81),
and X.Labs' custom AI-based app enhances the performance of the FLIR ONE Pro
camera as sold with its stock software (*id.* ¶¶ 4, 29, 49, 59, 77).

Remarkably, in quoting its April 14 claim that X.Labs' product "fundamen-
tally lacks accuracy," IPVM materially revises it, bracketing in language to suggest
that IPVM stated only that it tested *the FLIR ONE Pro camera*.  MTD 6 ("Feevr
'fundamentally lacks accuracy for its use, as its thermal provider FLIR has said and
IPVM testing [*of the FLIR ONE Pro*] has shown'") (our emphasis).  Yet the chal-
lenged statement contained no such qualification.  It stated unequivocally that "[the]
'Feevr' solution . . . fundamentally lacks accuracy for its use, as its thermal provider
FLIR has said and IPVM testing has shown."  1AC, Ex. 8, at 136.

IPVM's refusal to test X.Labs' entire product, including its custom AI-based
software, cannot be brushed off as nitpicking immaterial details of IPVM's analysis,
or for failing "to conduct the tests that [X.Labs] wanted."  MTD 15.  IPVM equates
testing the Feevr system with testing the FLIR ONE Pro camera, stating: IPVM "re-
port[ed] on the limits of the FLIR One Pro and, therefore, the Feevr system that relies
on it."  MTD 10.  But the Feevr system uses X.Labs' proprietary AI-based algorithms
and logical reasoning to enhance the accuracy of the FLIR ONE Pro camera by iden-
tifying the specific region of an individual's forehead that correlates to the temporal
artery, detecting the skin temperature of that region, and disregarding other temper-
atures in the field of view (the background noise, so to speak).  1AC ¶¶ 4, 29, 77.
The FLIR ONE Pro's stock software cannot do that, so it produces less accurate
results.  *Id.* ¶¶ 4, 29, 49, 59, 77, 82.  Thus, X.Labs *does* allege "how it could obtain
temperature screening results that exceed the published accuracy of the camera that
it uses or that are sufficient for human temperature screening results in real world
conditions."  MTD 12.  And while IPVM characterizes *Partington* as suggesting that

1  "reasonable minds can and do differ" over appropriate testing (MTD 16), that lan-

2  guage in fact refers to "what strategy should be adopted at trial."  56 F.3d at 1158.

3       IPVM describes its March 31, 2020, article without mentioning its statements

4  about the app.  MTD 4 ("In its first article about Feevr, published March 31, 2020,

5  IPVM reported that '[t]he Feevr thermal screening system consists of [a] FLIR One

6  Pro camera attached to an Android smartphone.'").  But as the Complaint alleges

7  (and the articles confirm), IPVM knew that the Feevr system also included X.Labs'

8  proprietary AI-based software, not FLIR's off-the-shelf SDK software, before it

9  published its articles.  *Id.* ¶¶ 2, 80, 82; *id.*, Ex. 7, at 127 ("The Feevr app performs

10  screening functions, essentially detecting faces in the field of view.").  IPVM even

11  published an "Update" to its March 31 article stating that, when it asked FLIR about

12  X.Labs' system, "FLIR responded saying, 'We don't have clarity on how they've

13  developed their product,'" noting only that FLIR *itself* "ha[s] a different set of cam-

14  eras that we market for elevated skin temperature screening."  *Id.*, Ex. 7, at 131.

15       IPVM, a product reviewer, thus knew that testing a unit of the actual Feevr

16  system—and not just its camera component—was critical to accurately and reliably

17  evaluating the Feevr system's accuracy.  1AC ¶¶ 2, 39-44, 80; *id.*, Ex. 4.  Yet IPVM

18  deliberately refused to conduct such testing, while announcing to the world that its

19  testing had shown the entire Feevr system to be fundamentally inaccurate.  *Id.* ¶¶ 6,

20  48, 53, 60, 68, 78, 81.  IPVM instead chose to cherry-pick from FLIR's out-of-con-

21  text statements about its One Pro camera and X.Labs' marketing materials.  *Id.* ¶¶ 2,

22  47, 53, 68, 74, 78, 81.  A responsible and truthful investigation, by contrast, would

23  have tested the actual Feevr system using sound engineering practices.  *Id.* ¶¶ 83-84.

24       IPVM's failure to conduct such testing before publishing its false statements

25  was malicious.  *Id.* ¶ 84.  Actual independent testing of the Feevr system by an en-

26  gineer skilled in the relevant field demonstrates that it is indeed accurate and reliable

27  for its intended use.  *Id.* ¶¶ 7-8, 84-109.  And having omitted to test or discuss the

28  capabilities of X.Labs' custom app, IPVM cannot be heard to say that it "thoroughly

detailed the evidence upon which it based its opinion[s]" that the Feevr *system* is fundamentally inaccurate.  MTD 15.

Each of IPVM's statements that the Feevr system is inaccurate are thus provably false, despite IPVM's purported (incomplete) disclosure of facts purportedly supporting its "opinions."  1AC ¶¶ 8, 47, 109; *see Milkovich*, 497 U.S. at 18; *Overstock.com*, 151 Cal. App. 4th at 705.[3]  And if IPVM "kn[ew] that its tests were potentially flawed" in a material way, but "failed reasonably to investigate," such facts amount to "clear and convincing evidence that [IPVM] was aware of the falsity of its [product] report."  *Suzuki*, 330 F.3d at 1139; *see Harte-Hanks*, 491 U.S. at 692-93 (defendant's failure to interview a key witness or listen to interview tapes or was "likely . . . a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of its claims and was "'unmistakably' sufficient to support a finding of actual malice").  Thus, X.Labs' allegations that IPVM purposefully avoided the truth properly allege actual malice.  *See* 1AC ¶¶ 2, 47, 68, 80, 82, 130, 146, 163, 182, 198, 213, 227, 240, 259.

IPVM's claim that X.Labs' testing conducted by Dr. Briant was "limited and flawed" and occurred under "idealized" conditions (MTD 12, 16) is attorney argument raising factual issues that cannot be resolved under Rule 12.  Further, IPVM's assertion that X.Labs fails to identify the camera used with the Feevr system in testing (MTD 5) ignores X.Labs' allegations that "[testing] clearly demonstrated each of IPVM's statements that the Feevr system is inaccurate are provably false—including . . . that *the FLIR One Pro used with the Feevr system* 'perform[s] inaccurately for human temperature detection.'"  1AC ¶ 109; *see id*. ¶ 26 (addressing the Feevr system utilizing the FLIR ONE Pro), ¶ 99 (discussing the testing setup).

[3] IPVM's reliance on *Underwager v. Channel 9 Austl.*, 69 F.3d 361 (9th Cir. 1995), and *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000) (MTD 20), is misplaced, as neither deals with whether a product review is opinion in light of the audience's expectations.  Indeed, neither case involved a claim that a product review was false.

1      IPVM dismisses Dr. Briant's testing as "not available . . . at the time IPVM it

2  published its articles."  MTD 5.  That misses the point—which is that responsible

3  testing, unlike IPVM's incomplete and indeed reckless testing, would have laid bare

4  the falsity of its claims about X.Labs' product.  Indeed, IPVM boasts of its "12,000+

5  square foot testing laboratory" and "12- to 15-person technologic team of engi-

6  neers."  1AC ¶¶ 2, 44.  All IPVM had to do was accept X.Labs' offer to provide a

7  unit of the Feevr system and test it.  *Id.* ¶¶ 6, 48, 53, 60, 68, 78, 81.

8      Here too, this case is on all fours with *Overstock.com*, where an internet sales

9  company brought a defamation suit against a publisher of subscriber-based analytic

10  reports on public companies.  Here, as there, IPVM "holds itself out to its subscribers

11  as having specialized knowledge," and "[i]ts business was built around developing

12  reader confidence to rely on its opinions as reflecting the truth."  151 Cal. App. 4th

13  at 706.  Here, as there, IPVM published a "flurry" of "negative reports" disparaging

14  X.Labs' product.  *Id.* at 693, 707, 709.  Here, as there, IPVM purportedly "stated

15  facts upon which [it] base[d]" its conclusion, but "the facts [were] incorrect or in-

16  complete" and its "assessment of them [was] erroneous."  *Id.* at 701.  And here, as

17  there, IPVM "stepped over the line into defamation."  *Id.* at 693.

18      Indeed, this is an a fortiori case under *Overstock.com*.  Unlike the defendant

19  there, IPVM did not include any disclaimers about its "judgment" being "subject to

20  change."  *Id.* at 704.  And whether X.Labs' product can accurately measure skin

21  temperature is easily more subject to a "right or wrong answer" than whether a com-

22  pany "materially" misrepresented its financials.  *Id.* at 706, 703.  Thus, like the plain-

23  tiff in *Overstock.com*, X.Labs has met its "minimum burden of defending against the

24  anti-SLAPP motion[]" and IPVM's motion should similarly be denied.  *Id.* at 711.

25      **b.**   **IPVM's statement regarding X.Labs' marketing**

26      In defending its statement about X.Labs' marketing, IPVM omits key lan-

27  guage from the statement: "IPVM's conclusion that its experts are 'particularly wor-

28  ried about . . . how misleading much of [Plaintiff's] marketing is.'"  MTD 17

(ellipses in original).  The actual statement, however, reads as follows:  "[W]e are particularly worried about *how accurate this will be and* how misleading much of their marketing is."  1AC ¶ 55 (emphasis added); *id.*, Ex. 7, at 130 (emphasis added).  As X.Labs alleges, this statement falsely implies that the Feevr system is inaccurate, and thus that X.Labs' marketing of that system is misleading because it attempts to conceal the system's alleged inaccuracy.  1AC ¶¶ 55, 125; *see* MTD 18 ("IPVM opined that Plaintiff's marketing . . . was 'misleading' because the FLIR One Pro used cannot accurately detect elevated body temperature.").  Thus, for all the reasons stated above, this statement too is a provably false factual assertion.

### c.  IPVM's statements that the Feevr system runs afoul of the FLIR SDK agreement and FDA regulations

IPVM also falsely implies that the Feevr system runs afoul of the FLIR SDK license agreement and FDA regulations.  MTD 12-14.  Contrary to IPVM's assertions, X.Labs *does* "dispute the accuracy of IPVM's [statement]" that the FLIR agreement "prohibits the use of . . . the FLIR ONE Pro . . . from apps like Feevr's."  MTD 12; 1AC ¶ 52 ("it is the "FLIR SDK," and not the FLIR ONE Pro, that 'may not be used'" under that agreement).  As X.Labs alleges, this statement is provably false because the agreement prohibits only use of the FLIR SDK, which X.Labs does not use.  1AC ¶¶ 25, 52; *id.*, Ex. 7, at 131.  And because IPVM's statement relies on facts that are "incorrect or incomplete" (*Milkovich*, 497 U.S. at 18), its "Update" stating that "Feevr says 'Feevr doesn't use the flir SDK.  Feevr uses it's [*sic*] own custom app witha [*sic*] FLIR camera'" does not lessen the statement's falsity.[4]

---

[4] IPVM implies that it mitigated the effects of its false statements by "updat[ing] its reporting" "[w]here Plaintiff provided additional factual information," but makes no claim that any of its purported updates are disseminated to readers.  MTD 2.  Thus, there is no reason to believe that IPVM's readers would be aware of these "updates" unless they independently and affirmatively checked IPVM's previously published articles for such "updates," which seems highly unlikely.

IPVM says "FLIR responded to this claim by confirming that the FLIR One Pro was not appropriate for Plaintiff's use of it," but FLIR's statement says nothing of the sort.  MTD 12.  It merely confirms that FLIR "[doesn't] have clarity on how" X.Labs "developed their product" and mentions that FLIR itself markets "a different set of cameras . . . for elevated skin temperature screening."  *Id.*

As to IPVM's other defenses of its statements about FDA regulations (MTD 13-14), the salient point is that IPVM, through carefully worded statements, falsely implies that X.Labs is attempting to conceal FDA violations when the Feevr system's technical specification itself states that the Feevr system is not FDA-approved. 1AC ¶ 61.  IPVM describes X.Labs as having "*admitted* the lack of approval" as though this is equivalent to a confession.  *Id.*  A reasonable jury could plainly find that IPVM's statements imply a false assertion of fact.

**C.    X.Labs' remaining state law claims are adequately pled.**

**1.    Intentional interference with contractual relations**

IPVM also says X.Labs inadequately pled the knowledge and intent elements of its claim for intentional interference with contractual relations.  MTD 21-23.  On the contrary, X.Labs has adequately pled those elements.

As to knowledge, the Complaint alleges that "IPVM is and, at all material times, has been aware of the existence of these contracts"; that IPVM's March 31 article stated that the Feevr system "consists of the FLIR One Pro camera," and that IPVM's April 14 article refers to X.Labs' "thermal provider FLIR."  1AC ¶ 121; *id.*, Ex. 7, at 127; *id.*, Ex. 8, at 135; MTD 19.

As to intent, X.Labs alleges that "IPVM engaged in conduct that was calculated to disrupt X.Labs' contractual relations and rights under those contracts and that it knew was certain or substantially certain to result in such disruption and achieved those ends," such as by publishing "prominently, falsely, and defamatorily . . . that the Feevr system '*fundamentally lacks accuracy for its use*' and that '*false*

*positives and negatives are highly likely*'" when using that system.  1AC ¶ 122. X.Labs further alleges that IPVM's articles are directed to its customers and suppliers since, on information and belief, "IPVM's subscribers and members," i.e., its readers, "included X.Labs' customers, potential customers, suppliers, and development partners." *Id.* ¶ 110; *see id.* ¶ 43 ("IPVM's subscribers and members access its content by logging into IPVM's website").  IPVM's articles are thus published to those parties, one of which is FLIR.  *Id.* ¶ 45, 178, 232, 250.

As IPVM's own authority confirms, these allegations easily satisfy the knowledge and intent requirements.  *See Silicon Knights v. Crystal Dynamics*, 983 F. Supp. 1303, 1310 (N.D. Cal. 1997) ("Plaintiff's general allegations of [defendant's] knowledge of the underlying contracts, and its wrongful intent in interfering with the [] contractual relationships . . . is not fatal to the complaint.").

### 2.    Intentional and negligent interference with prospective economic relations

IPVM next says X.Labs inadequately pled that IPVM was aware of X.Labs' prospective economic relationships.  MTD 24.  But X.Labs alleges that "IPVM is and, at all material times, has been aware of the existence of X.Labs' prospective contractual relationships" and "would not have published the IPVM Articles had it been unaware of these prospective contractual relationships."  1AC ¶¶ 137, 154. Further, as X.Labs alleged, IPVM's April 14 article stated:  "we believe Feevr" that "they are selling a lot of these [Feevr system] devices right now." *Id*. ¶ 121; *id.*, Ex. 8, at 139.

IPVM also invokes the "duty of care" element (MTD 24), which requires that "the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its action would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship." *Nolan Miller Inc. v. Hees*, 2018 WL 3533392, at *7 (C.D. Cal. July 20, 2018).  But IPVM's April 14 statement that

"we believe Feevr . . . that they are selling a lot of these [Feevr system] devices right now" establishes that it knew of X.Labs' prospective economic relationships with its customers.  1AC ¶ 121; *id.*, Ex. 8, at 139.  X.Labs also alleges that "IPVM knew or should have known that its false, misleading, and deceptive statements would disrupt X.Labs' ongoing business negotiations with prospective customers if IPVM failed to act with reasonable care." *Id.* ¶ 164.  Thus, X.Labs alleges that IPVM knew that these business relationships existed and that its actions could cause X.Labs to lose out on future economic benefits of such relationships.

### 3. Trade libel

As to X.Labs' trade libel claim, IPVM says X.Labs has not adequately pled special damages.  MTD 25.  To allege "'a prime facie case'" of that element, X.Labs "must 'identify[] customers or transactions lost as a result of disparagement'" (*Elec. Frontier Found. v. Glob. Equity Mgmt. (SA) Pty Ltd*, 290 F. Supp. 3d 923, 945 (N.D. Cal. 2017))—which is precisely what X.Labs has done in the following allegations:

> [F]ollowing the publication of IPVM's March 31, 2020, April 14, 2020, and April 17, 2020 Articles, a customer that is an international, American publicly traded web hosting company put its 100-unit order of the Feevr system on hold, resulting in a loss of $350,000 in revenue to X.Labs. . . .

> [A]n American social media corporation customer and a Japanese e-commerce company each suspended their orders of X.Labs' Feevr system due to the March 31, 2020 Article, resulting in a loss of $750,000 in revenue to X.Labs. . . .

> wework, which had been in the process of placing an order for the Feevr system, suspended its pending purchase because of the May 7, 2020 Article. . . .

> [A] Westrock representative advised that Westrock had been interested in purchasing the Feevr system but moved instead to using other FLIR and ICI technology based on the purported legal concerns between X.Labs and FLIR.

1AC ¶ 111, 113.  Thus, X.Labs has adequately pled special damages.

### 4.     California unfair competition and false description and false representation

According to IPVM, the state law unfair competition and false description and false representation claims[5] fail because its speech is not commercial and it does not compete with X.Labs.  MTD 23, 25-26.  IPVM misunderstands X.Labs' allegations.

The Complaint alleges that IPVM, which is funded by subscription-based memberships, has a business interest in publishing false statements regarding the Feevr system because doing so could generate increased subscription fees and increased subscriber and member traffic to its website.  1AC ¶¶ 12, 43-45, 214, 228, 243, 261.  X.Labs further alleges, on information and belief, that various IPVM subscribers and members compete with X.Labs and would benefit competitively from IPVM's defamatory statements about the Feevr system.  *Id*. ¶¶ 45, 232, 250.

Moreover, X.Labs specifically alleges on information and belief that one such IPVM subscriber and member is FLIR, with whom IPVM repeatedly communicated in curating and publishing the false statements here.  *Id.* ¶¶ 52, 59, 62, 232, 250; *id.*, Ex. 7, at 130 ("We have asked FLIR for confirmation on Feevr's claim"; "FLIR has responded, denying Feevr's claims"), 131 ("[FLIR] confirmed the FLIR SDK clause about not marketing for medical or health purposes. . . . We have asked FLIR for comment and confirmation. . . . FLIR responded saying 'We don't have clarity on how they've developed their product, but as we have mentioned before, *we have a different set of cameras that we market for elevated skin temperature screening.  The FLIR ONE Pro is not on that list.*") (emphasis added); *id.*, Ex. 8, at 137 ("FLIR's

---

[5] To state an unfair competition claim, X.Labs must plead (1) an unlawful, unfair, or fraudulent business act or practice, or (2) an unfair, deceptive, untrue, or misleading advertisement.  *Joint Stock Co. v. Riviera Travel & Tours, Inc.*, 2014 WL 2889756, at *12 (C.D. Cal. June 25, 2014).  To state a claim for false description and false representation, X.Labs must plead (1) an untrue or misleading statement, (2) which is known or reasonably should be known to be untrue or misleading, and (3) is made to dispose of goods, perform services, or induce obligations.  *Arakelian v. Mercedes-Benz USA, LLC*, 2018 WL 6422649, at *4 (C.D. Cal. June 4, 2018).

spokesperson reinforced that problem, confirming to IPVM: 'We do not recommend the FLIR ONE Pro or Lepton-based devices for this use case.'").

As X.Labs further alleges, FLIR's motivation for criticizing the Feevr system and notifying X.Labs of its intent to terminate its 2020 PSA with X.Labs arises out of the negative impact that sales of the Feevr system may have on sales of FLIR's more expensive thermal cameras. *Id.* ¶¶ 45, 93, 232, 250; *id.*, Ex. 10, at 165 ("FLIR wants to sell 20-50K cameras for medical-grade fever detection. [X.Labs is] selling a 2K version with hardware that FLIR says should not be used for this purpose."); *id.*, Ex. 10, at 166 ("FLIR seemed to miss taking that into account. Even though maybe they were thinking that anyone buying $2K of equipment was going never going to buy $20K in equipment."); *id.*, Ex. 15, at 178 ("Using FLIR for elevated skin temperature screening"; "thermal imaging cameras can be used to detect elevated skin temperature or EST . . . A 320x240 pixel camera can safely accomplish the mission."). Thus, IPVM had an economic incentive to publish defamatory statements about the Feevr system, rendering the statements commercial speech.

As to IPVM's opposition to injunctive relief (MTD 27), its statements are not protected speech for the reasons discussed above. Thus, awarding injunctive relief would not act as an unconstitutional prior restraint on protected speech.

**D.    X.Labs' federal Lanham Act claim is adequately pled.**

Finally, X.Labs properly pled its Lanham Act claim. Citing *Jack Russell Terrier Network v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005), IPVM states that X.Labs must allege that IPVM's conduct is "harmful to [X.Labs'] ability to compete with [IPVM]," but that "IPVM is not selling remote fever detection systems" and thus "is not competing with [X.Labs]." MTD 28. In 2014, however, the Supreme Court rejected a "categorical test permitting only direct competitors to sue for false advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014). IPVM is thus "mistake[n]" in arguing "that because the

Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors." *Id.* at 136.

Instead, "a direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue." *Id.* at 134. Under the zone-of-interests test, X.Labs "must allege an injury to a commercial interest in reputation or sales." *Id.* at 131-32. The Complaint does precisely that.

X.Labs' Lanham Act claim falls under 15 U.S.C. § 1125(a)(1)(B), which protects against false description and false representation—i.e., commercial promotion. As discussed above (at 27-28), X.Labs alleges that IPVM had an economic incentive to publish its false and defamatory statements and thereby generate increased membership subscription fees and subscriber traffic to its website because various of its subscribers (including FLIR) compete with X.Labs. And IPVM's articles propose a commercial transaction by recommending that readers not buy the Feevr system. 1AC, Ex. 7, at 130 ("We are particularly worried about how accurate this will be and how misleading much of their marketing is."); *id.*, Ex. 8, at 135 ("Beware of 'Feevr'. The company is marketing a 'Feevr' solution that fundamentally lacks accuracy for its use"), 141 ("if despite the issues . . . , customers want to use such a device for 'fever detection', so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis."). Post-*Lexmark*, that is sufficient.

Finally, citing *Ariix, LLC v. NutriSearch Corp.*, 2018 WL 1456928 (N.D. Cal. Aug. 2, 2019), IPVM asserts that the Lanham Act does not apply to product reviews. MTD 30. But that assertion is incorrect, and mischaracterizes *Ariix*. The complaint there did not allege that the defendant said anything false or damaging about the plaintiff directly, but rather that the defendant had damaged the plaintiff by describing it less favorably than its competitor. *Id.* at *1. Further, the court used the term "product review" to mean a "comprehensive" guide that "review[s] at least a good portion of all relevant products." *Id.* at *6; *id.* ("Usana and Ariix are not the only

companies, and their products are not the only ones reviewed or compared").  That is a far cry from the hit pieces that IPVM specifically wrote about X.Labs.

## V.    CONCLUSION

When IPVM told the world that the Feevr system is "highly likely" to produce "false" results (1AC, Ex. 7, at 128), X.Labs immediately explained why it was wrong—X.Labs "doesn't use the flir SDK [software development kit]," but rather uses its "own custom app" with AI-based "screening functions" that enhance the FLIR ONE Pro's accuracy in measuring skin temperature.  1AC, Ex. 7, at 131.  IPVM acknowledged receiving this information, and FLIR told IPVM:  "We don't have clarity on how they've developed their product."  1AC, Ex. 7, at 131.  But then, without having tested anything but the FLIR ONE Pro equipped with off-the-shelf software, IPVM doubled down.  Its April 14 article announced: "The facts remain," and X.Labs' Feevr solution "fundamentally lacks accuracy for its use, as its thermal provider FLIR has said and IPVM testing has shown."  1AC, Ex. 8, at 138.

Now, IPVM insists that its "facts" were in reality statements of "opinion" that either are "based on accurate, disclosed facts" or "are not capable of being proved true or false."  MTD 2, 19.  Nonsense.  Whether a product correctly measures skin temperature is "objectively verifiable," "a reasonable factfinder" could conclude that IPVM's statements "imply [a false] assertion" of fact, and the disclosed bases for IPVM's view "are either incorrect or incomplete, or [IPVM's] assessment of them is erroneous."  *Milkovich*, 497 U.S. at 18, 21.  IPVM's motion should be denied.

Dated:  October 7, 2020

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Lisa D. Zang*
    Edward G. Poplawski
    Steffen N. Johnson
    Lisa D. Zang

Attorneys for Plaintiff Royal Holdings
Technologies Corp. d/b/a X.Labs