UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No.: | 2:20-cv-04093-SB (PLAx) | Date: | December 18, 2020 |

| | |
|---|---|
| Title: | *Royal Holdings Technologies Corp. v. IP Video Market Info Inc.* |

| | |
|---|---|
| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |

| Victor Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** **ORDER RE: DEFENDANT'S SPECIAL MOTION TO STRIKE AMENDED COMPLAINT PURSUANT TO CAL. CIV. PROC. CODE § 425.16 & MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) [DKT. NO. 33]**

Before the Court is the Special Motion to Strike and Motion to Dismiss filed by Defendant IP Video Market Info Inc. ("IPVM" or "Defendant"). (Mot., Dkt. No. 33.) Plaintiff Royal Holdings Technologies Corp. d/b/a X.Labs ("X.Labs" or "Plaintiff") opposes. (Opp., Dkt. No. 37.) IPVM has replied. (Reply, Dkt. No. 45.) For the reasons below, the Court **GRANTS in part and DENIES in part** the motions.

## FACTUAL BACKGROUND

The world is in the midst of the COVID-19 pandemic. (First Amended Compl. ("FAC") ¶¶ 17-19, Dkt. No. 23.) The range and severity of symptoms vary significantly, with some individuals experiencing no or mild symptoms and others experiencing severe illness, and even death. (*Id.* ¶ 20.) Common symptoms of COVID-19 include fever, cough, and shortness of breath. (*Id.* ¶ 21.) Screening

measures for asymptomatic individuals have included measurements for elevated body temperature.  (*Id.*)

On March 25, 2020, X.Labs launched "Feevr," a "proprietary AI-based rapid thermal screening system" that is intended to "screen and detect individuals in a crowd with an elevated forehead skin temperature."  (*Id.* ¶¶ 22-23.)  When Feevr detects an individual's temperature that meets a certain threshold, it displays an alert and captures a screenshot of the thermal image, allowing the user to identify individuals with an elevated forehead skin temperature from a distance.  (*Id.* ¶¶ 31-32.)  The Feevr app utilizes a thermal imaging camera, such as the FLIR ONE Pro camera.  (*Id.* ¶ 24.)  Feevr uses its own AI-based software algorithm developed by X.Labs and does not use the FLIR Software Development Kit ("SDK").  (*Id.* ¶ 25.)

IPVM is a group of reporters and experts that purportedly are the "world's leading authority on video surveillance."  (*Id.* ¶ 40.)  On its website, IPVM describes its business as "preparing technical expert reports, testing, analysis, and educational courses in video surveillance."  (*Id.*)  Although IPVM is a subscriber-based business, it does make some of its content available to non-subscribers.  (*Id.* ¶ 43.)  IPVM published a series of articles about Feevr.

*Article No. 1.*  On March 31, 2020, IPVM published an article on its website titled "USA's Feevr Thermal System Examined."  (*Id.* ¶ 46, Ex. 7, Dkt. No. 23-7.)  The subheading states:  "This US company has burst on to the scene, brashly naming itself 'feevr' and branding itself as a 'COVID 19 - AI BASED NON CONTACT THERMAL IMAGING.'"  Underneath the subheading, the article states:  "IPVM Examines USA's feevr Thermal Temperature System."

The article reported that "[t]he Feevr thermal screening system consists of [a] FLIR One Pro camera attached to an Android smartphone."  (*Id.* at 127.)  In its review, IPVM evaluated Feevr's accuracy claims, stating:

> Feevr does not make specific accuracy claims in their documentation other than the one vague claim of being within 0.4° (0.2° C) of an "FDA approved temperature gun."  However, the FLIR One Pro specifies accuracy of only ±3° C (~5.4° F), a huge range for measuring body temperature.  By contrast, most of the systems we have surveyed claim accuracy of ±0.3° C or lower, only about 0.5° F.  Because the forehead and face are highly susceptible to variations caused by [the] environment and activities of the person screened (e.g.

exercising or consuming alcohol), combined with the limited accuracy
FLIR One Pro camera, false positives and negatives are highly likely.

(*Id.* at 127-28.)

IPVM also evaluated Feevr's marketing under a heading entitled
"Aggressive/Misleading Marketing Challenges."  (*Id.* at 128-30.)  The article notes
that Feevr repeatedly refers to Covid-19 in its marketing materials and then states:
"But no screening system can detect coronavirus, regardless of what is claimed."
(*Id.*)  The article also notes that "the script of one of Feevr's marketing videos is
mostly stolen from a FLIR post."  (*Id.*)  In its conclusion, the article claims that
IPVM is "particularly worried about how accurate this [product] will be and how
misleading much of [Feevr's] marketing is."  On the "plus" side, the article
continues, the product is inexpensive for the many users who will "abandon" it "in
a matter of months" and for those who use the product as a "placebo."  *Id.* at 130.

The article was subsequently updated.  IPVM added an additional section
titled, "UPDATE – FLIR SDK Violation Risk," which noted that FLIR's license
agreement "prohibits the use of FLIR devices, like the FLIR ONE Pro that Feevr
uses, from apps like Feevr's."  (*Id.* at 130-31.)  The article was again updated to
include comments from both Feevr (stating that it did not use the FLIR SDK) and
FLIR (stating that it did not know how X.Labs developed Feevr but reiterating that
the FLIR ONE Pro was not intended for "elevated skin temperature screening").
(*Id.*)

X.Labs alleges that IPVM declined its offer to provide a unit of the Feevr
system for testing and did not request any technical documentation from X.Labs
before publishing its March 31, 2020 article.  (FAC ¶ 53.)

*Article No. 2.*  On April 14, 2020, IPVM published a second article on its
website titled "Beware of Feevr."  (*Id.* ¶ 57, Ex. 8, Dkt. No. 23-8.)  The subheading
states:

Beware of "Feevr."  The company is marketing a "Feevr" solution
that fundamentally lacks accuracy for its use, as its thermal provider
FLIR has said and IPVM testing has shown.  Plus, it lacks FDA
approval, as the company's premier distributor has admitted.  Feevr
has refused to address these fundamental issues, instead repeatedly
threatening legal action against IPVM.

(*Id.* at 135.)  Below the subheading is a graphic depiction of the Feevr product with the stamp "BEWARE" along with a photograph of X.Labs's CEO, Barry Oberholzer—a person later described in the article as a "Wanted Man in South Africa."  (*Id.*)

Like the previous article, the second article analyzes the claimed accuracy of Feevr, stating that it is inaccurate because of the limitations of the FLIR ONE Pro. (*Id.* at 137.)  Responding to Feevr's statement that its product specifications and capabilities are on par with FDA-approved thermal guns, IPVM stated:  "[T]hat is simply wrong . . . [because] the FLIR One Pro they use is 10x less accurate than, e.g., FLIR's FDA approved thermal gun . . . ."  (*Id.*)  IPVM further stated that it "tested the FLIR Pro One and it performed inaccurately for human temperature detection, just as FLIR indicated."  (*Id.*)  After dismissing Feevr's legal threats, IPVM states:  "The facts remain.  The thermal sensor they are using is not specified nor recommended by their provider for such a 'feevr' application.  And Feevr cannot address this, only threaten legal action."  (*Id.* at 137-38.)  IPVM further states that Feevr "violates FDA rules."  (*Id.* at 138-39.)  The article concludes:  "And, if despite the issues raised by their thermal provider FLIR and the lack of FDA approval, customers want to use such a device for 'fever detection,' so be it, but this does pose risks to the public who may depend on this to avoid being infected in this ongoing crisis."  (*Id.* at 141.)

X.Labs alleges that IPVM again declined its offer to provide a unit of Feevr to test.  (FAC ¶ 60.)

*Article No. 3.*  On April 17, 2020, IPVM published a third article on its website, discussing the FDA's decision to temporarily suspend its clearance requirements for companies marketing fever-detection cameras during the pandemic.  (*Id.* ¶ 66, Ex. 9, Dkt. No. 23-9.)  Under the heading "Risk: Dubious Companies Rewarded," IPVM lists Feevr.  (*Id.* at 157.)  IPVM states that the FDA's decision "presents a risk to the public since often these companies are totally new entrants to the thermal field and do not offer the right kind of camera, setup advice, etc.  This could lead to many false positives/negatives and poor implementation."  (*Id.* at 157-58.)

*Article Nos. 4 & 5.*  On May 7, 2020, IPVM published a fourth article on its website, stating that FLIR had suspended its agreement with X.Labs.  (FAC ¶ 70, Ex. 10, Dkt. No. 23-10.)  The article also repeats IPVM's previous statements about "Feevr's FLIR usage, both on accuracy and using the FLIR SDK."  (*Id.* at 162.)  On May 20, 2020, IPVM published a fifth article, stating that FLIR had

cancelled a contract with X.Labs and was in the process of cancelling a second contract.  (FAC ¶ 76, Ex. 11, Dkt. No. 23-11.)

## PROCEDURAL HISTORY

X.Labs filed this lawsuit on May 4, 2020.  (Compl., Dkt. No. 1.)  X.Labs's 50-page complaint asserted nine claims for relief for:  (1) intentional interference with contractual relations; (2) intentional interference with prospective economic relations; (3) negligent interference with prospective economic relations; (4) defamation under Cal. Civ. Code §§ 44 *et seq.*; (5) trade libel; (6) unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.*; (7) common-law unfair competition; (8) false description and false representation under 15 U.S.C. § 1125(a); and (9) false description and false representation under Cal. Bus. & Prof. Code §§ 17500 *et seq.*  IPVM filed a special motion to strike and a motion to dismiss the Complaint on July 2, 2020.  (Dkt. No. 20.)  X.Labs then filed a 112-page FAC on July 23, 2020, asserting the same nine claims for relief.  IPVM filed these motions on August 21, 2020.

## DISCUSSION

## I.   SPECIAL MOTION TO STRIKE

California's anti-SLAPP statute allows for pre-trial dismissal of Strategic Lawsuits against Public Participation through a "special motion to strike."  Cal. Code Civ. P. § 425.16.  The statute seeks to identify early on "meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation."  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).  A court considering an anti-SLAPP motion engages in a two-step inquiry.  *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010).  First, the defendant "must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003).  Second, once the defendant has made a prima facie showing, "the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims."  *Id.*

"Anti-SLAPP motions are hybrids of motions to dismiss and motions for summary judgment."  *Planned Parenthood Fed. Of Am., Inc. v. Ctr. For Med. Progress*, 890 F.3d 828, 836 (9th Cir. 2018).  When the motion only challenges the legal sufficiency of the claims, a plaintiff is not required to submit evidence, and the district court applies the Federal Rule of Civil Procedure 12(b)(6) standard.  *Id.*

at 835.  Conversely, when the motion challenges the factual sufficiency of a claim, a plaintiff is allowed to submit evidence to address the factual challenge, and the court applies the Federal Rule of Civil Procedure 56 standard.  *Id.*  Here, the Rule 12(b)(6) standard applies because IPVM's anti-SLAPP motion challenges the legal sufficiency of X.Labs's claims.  *Id*. at 835.

## A.     Step 1 – Protected Activity

The first step in the anti-SLAPP analysis evaluates whether the defendant has successfully made "an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech." *Vess*, 317 F.3d at 1110; *see also City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002).  Such acts include "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Cal. Code Civ. P. § 425.16(e).  X.Labs contends that IPVM's statements do not qualify for anti-SLAPP protection for two reasons.  Neither is persuasive.

First, X.Labs asserts that IPVM's statements do not relate to an issue of public interest because they only address the technical specifications of Feevr. (Opp. at 12.)  This narrow interpretation does not square with the Ninth Circuit's broad interpretation of what constitutes a "public issue or issue of public interest." *See Hilton v. Hallmark Cards*, 599 F.3d 894, 906 (9th Cir. 2010).  X.Labs's attempt to analogize its lawsuit to a case involving a product review of a weight-loss supplement, *GOLO, LLC v. Higher Health Network, LLC*, No.: 3:18-cv-2434-GPC-MSB, 2019 WL 446251, at *13-14 (S.D. Cal. Feb. 5, 2019), is unavailing. Feevr does not pretend to be an ordinary product of ordinary interest during an ordinary time.  Nor does IPVM treat it as such, stating that Feevr "pose[s] risks to the public who may depend on this to avoid being infected in this ongoing crisis." (FAC ¶ 57, Ex. 8.)  Commentary on the efficacy of a product designed to help prevent the spread of a deadly infection during a global pandemic surely concerns an issue of public interest.  *See Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 900-01 (2004) (statements containing "consumer protection information" are made "in connection with an issue of public interest").

Second, X.Labs argues that IPVM's statements cannot receive anti-SLAPP protection because they were made on IPVM's website, which has some of its content behind a nonpublic paywall.  (Opp. at 12.)  But as IPVM correctly notes (Reply at 2), the forum in question "need not be an open forum to be a public forum—it is enough that it can be purchased and read by members of the public." *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1039 (2008).

In sum, the challenged statements in the IPVM articles satisfy the first step of the anti-SLAPP inquiry.

## B.     Step 2 – Probability of Success

Since IPVM has shown that this lawsuit arises from protected activity, the burden shifts to X.Labs to show a "'reasonable probability' of prevailing in its claims for those claims to survive dismissal." *Metabolife Int'l*, 264 F.3d at 840. "Reasonable probability" requires only a "minimum level of legal sufficiency and triability." *Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429, 438 n. 5 (2000); *see also Navellier v. Sletten*, 29 Cal. 4th 82, 95 n. 11 (2002) (labeling the second prong the "minimal merit prong"). While courts examine the pleadings and supporting and opposing affidavits, they do not weigh the evidence or determine credibility but rather accept as true admissible evidence in favor of the plaintiff. *Piping Rock Partners, Inc. v. David Lerner Assocs. Inc.*, 946 F. Supp. 2d 957, 967 (N.D. Cal. 2013) *aff'd*, 609 Fed. Appx. 497 (9th Cir. 2015).

Under California law, defamation is "the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007) (quoting *Ringler Associates Inc. v. Maryland Casualty Co.*, 80 Cal. App. 4th 1165, 1179 (2000)).[1]  To establish falsity, a plaintiff must show the statement of fact is provably false.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).  That is, statements of opinion are actionable only if they are "sufficiently factual to be susceptible of being proved true or false."  *Id.* at 21.  The dispositive question is "whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion."  *Seelig v. Infinity Broadcasting Corp.*, 97 Cal. App. 4th 798, 809 (2002).  That question must be considered in the "totality of the circumstances."  *Id.* (quoting *Rudnick v. McMillan*, 25 Cal. App. 4th 1183, 1191 (1994)).

In the Ninth Circuit, courts consider the totality of the circumstances using a three-prong test.  *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1074-75 (9th Cir.

---

[1] The Court analyzes only the defamation claim here because all other causes of action derive from that claim.

2005).[2]  First, courts "look at the statement in its broad context, which includes the general tenor of the work, the subject of the statements, the setting, and the format of the work." *Id.* at 1075.  Second, courts examine "the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." *Id.*  Third, courts "inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Id.*

### 1.    The General Context

The IPVM articles purport to provide a serious, objective analysis of a product based on relevant expertise.  Against the backdrop of an ongoing pandemic, the articles criticize Feevr's accuracy and suggest that the use of this product "pose[s] risks to the public who may depend on this to avoid being infected in this ongoing crisis."  (FAC, Ex. 8.)

*Overstock.com v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688 (2007) is instructive.  In *Overstock.com*, defendant Gradient was a subscriber-based analytical reporting service.  *Id.* at 693-94.  Gradient's subscribers were large institutional investors who would receive Gradient's "earnings quality analytics" reports rating public companies on an "A" through "F" scale.  *Id.* at 694.  Gradient's subscribers could also obtain custom reports on a specific company.  *Id.*  At the behest of a subscriber that wanted to "short" Overstock shares, Gradient wrote several reports giving Overstock a "D" or "F."  *Id.* at 696-97.  Overstock then sued for libel and other claims.  *Id.* at 697-98.

In affirming the denial of the anti-SLAPP motion, the court found the tone and content of the reports were "serious."  *Id.* at 705.  The court noted that Gradient "holds itself out to its subscribers as having specialized knowledge," expects its readers "to rely on its opinions as reflecting the truth," and "characterizes its reports, alerts and bulletins as presenting the firm's 'unbiased, independent and objective analysis of a company's earnings quality' . . ."  *Id.* at 705-06.  Here, IPVM holds itself out as "the world's leading authority on video surveillance, delivering unmatched reporting, research, and test results" (FAC ¶ 40, Ex. 4, Dkt. No. 23-4), characterizes its reporting as "independent" and "objective"

---

[2] *See, e.g.*, *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053-55 (9th Cir. 1990) (first to apply three-part test after *Milkovich*); *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995) (acknowledging test enumerated in *Unelko*); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (same).

(Mot. at 3), and claims its "site is the most read and discussed resource by leading executives, designers, and technologists in the security industry" (*id.*).

## 2.     The Specific Context

The Court next looks at the specific context of IPVM's statements about the accuracy of Feevr.  Even where the general tenor of the statement is one of opinion, the statement may constitute actionable defamation if it implies an assertion of objective fact.  *Partington*, 56 F.3d at 1155.  However, the use of "loose, figurative, or hyperbolic" language tends to "negate the impression" that a statement contains an assertion of verifiable fact.  *Milkovich*, 497 U.S. at 21.

In their specific context, many of the challenged statements appear factual in nature here.  IPVM focuses on the product's use of the FLIR One Pro to measure X.Labs's representations of Feevr's accuracy.  Under that measure, IPVM repeatedly asserts that the product badly fails.  In support of this fact, IPVM relies on the specifications of FLIR One Pro's manufacturer—which provides an accuracy range of ±5.4° F, rendering the product useless for its intended purpose (i.e., measuring body temperature).  In further support, IPVM noted that the manufacturer confirmed that the FLIR One Pro was not designed to measure elevated body temperature.  IPVM also reported that its own testing of the FLIR One Pro found that it was unable to accurately measure body temperature.

## 3.     Susceptible of Being Proved True or False

The Court last examines whether the statements are susceptible of being proved true or false.  *Id.* at 1054-55.  The statements that X.Labs alleges are defamatory fall into three categories:  (1) Feevr's accuracy and usage of the FLIR One Pro; (2) X.Labs's marketing of Feevr; and (3) FDA approval.  IPVM argues that X.Labs cannot prove its statements to be false because they are either accurate or opinions "based on accurate, disclosed facts."

### a.     Statements About the Accuracy of Feevr

The statements about Feevr's inaccuracy can be proven to be true or false. IPVM stated that "[Feevr] fundamentally lacks accuracy for its use," and that use of the FLIR One Pro was "nowhere close enough to the precision needed."  (FAC,

Ex. 8.)  Whether Feevr is accurate—i.e., "able to give an accurate result"[3]—is capable of demonstration.

*Unelko* supports this conclusion.  Andy Rooney of *60 Minutes* made an on-air statement about a product called "Rain–X" when discussing "junk" he received in the mail.   Rooney stated:

> Here's something for the windshield of your car called Rain–X. The fellow who makes this sent me a whole case of it.  He's very proud of it.  I actually spent an hour one Saturday putting it on the windshield of my car. I suppose he'd like a commercial or a testimonial.  You know how they hold the product up like this? It didn't work.

912 F.2d at 1051.  In a subsequent segment of *60 Minutes*, Rooney read the Rain–X label claiming to "[d]ramatically improve[] wet weather visibility" and repeated that "it didn't work for [him]."  *Id.* at 1052.

Resorting to the dictionary definition of "work," the Ninth Circuit noted that the word means "to function or operate according to plan or design"—which is "a standard capable of objective determination . . . when applied to a product designed to improve visibility."  *Id.* at 1055; *see also id.* (finding that "a factfinder could conclude that Rooney's statement that Rain–X 'didn't work' implied an assertion of objective fact").  From *Unelko* it follows that IPVM's statements that Feevr "fundamentally lacks accuracy" are subject to proof of truth or falsity through product testing.

IPVM's arguments to the contrary are not persuasive.  First, IPVM attempts to isolate the statements made about Feevr's accuracy to the FLIR One Pro camera system.  (Mot. at 10-13.)  This attempt at isolation, however, fails the totality-of-the-circumstances test.  To remove the statement from its overall context would not only fail the legal test but also would render the product evaluation confusing.  Why test the accuracy of the FLIR One Pro in the context of the Feevr product if the results did not measure the accuracy of the product?  The answer to the question that many, if not most, readers would reach—namely, that the accuracy of the camera determines the accuracy of the product—presents another legal obstacle for IPVM.  Even if it did not directly state that Feevr is inaccurate, IPVM may still be liable if the statement(s) implied a false assertion of fact.  *Milkovich*, 497 U.S. at

---

[3] "accurate."  Merriam-Webster Online Dictionary. 2020. https://www.merriam-webster.com (Dec. 15, 2020).

18.  At a minimum, the articles implied that Feevr was inaccurate.  (FAC, Exs. 7, 8 ("USA's Feevr Thermal Temperature System Examined"; "Beware of Feevr"; "'Feevr' solution [] fundamentally lacks accuracy for its use").

Second, IPVM contends that its statements are protected opinion because they are based on "undisputed, disclosed facts" about its testing of the FLIR One Pro.  (Mot. at 14-17.)  This contention reads too much into the legal principle upon which IPVM relies.  *See Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1068 (9th Cir. 1998) (stating the principle that "an opinion based on an implication arising from disclosed facts is not actionable when the disclosed facts themselves are not actionable").  The principle is a corollary of the general requirement that a statement be judged in context.  *See Standing Comm. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995) (noting that the disclosure of facts surrounding an opinion renders it "unlikely . . . [that readers will] construe the statement as insinuating the existence of additional, undisclosed facts"); *see also Dodds*, 145 F.3d at 1068 n.7 (noting that "segment as a whole conveys a message that is too debatable and subjective to meet the *Milkovich* standard"); *see also Partington*, 56 F.3d at 1156 (finding statements "protected since, read in context, they are not statements implying the assertion of objective facts but are instead interpretations of the facts available to both the writer and the reader").

IPVM cannot seek protection in this principle.  "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact."  *Milkovich*, 497 U.S. at 18-19.  Here, IPVM did not say that it was testing the camera solely to test the camera's accuracy, and it did not disclose that any statement about the camera's accuracy did not bear on the utility of Feevr for its intended purpose.  Nor would such disclosures or disclaimers make sense in the context of a product review to determine the accuracy of Feevr in measuring forehead skin temperature.  A reader of a product review that focuses solely on the camera in determining the product's accuracy might reasonably get the idea that the product's accuracy depended on the accuracy of the camera.  IPVM's arguments to the contrary miss this point.  (*See, e.g.*, Mot. at 15 (arguing that it was "not required to conduct the tests that Plaintiff wanted it to conduct or to base its opinions only on information Plaintiff wanted it to use").)  X.Labs alleges that its proprietary AI-based software makes all the difference, enhancing the capabilities of the hardware by "identifying the specific region of an individual's forehead that correlates to the temporal artery, detecting skin temperature of that region, and disregarding other temperatures in the field of view (the background noise, so to speak)."  (Opp. at 19 (citing FAC ¶¶ 4, 29, 77).)  Whether this

allegation is true is another matter—but it is not for this Court in ruling on an anti-SLAPP motion to decide that question.  It is enough at this point that X.Labs has shown that the facts disclosed by IPVM were "incomplete" and that IPVM's statements falsely implied that the accuracy of Feevr depended entirely on the accuracy of its camera.  *Milkovich*, 497 U.S. at 18-19.

Third, IPVM asserts that X.Labs's "post-hoc" testing of Feevr cannot render IPVM's statements about Feevr defamatory.  (Mot. at 16.)  The point of the testing, however, is not *when* it was done but *whether* it can be done to prove the truth or falsity of the challenged statements.  X.Labs alleges that IPVM knew Feevr utilized a different, proprietary AI-based algorithm, not the FLIR SDK, and elected not to test the entire system to determine its accuracy, despite X.Labs's offers.[4]

Thus, X.Labs has met its "minimal burden of defending against the anti-SLAPP motion['s]" challenge to the statements about Feevr's accuracy.  *Overstock.com*, 151 Cal. App. 4th at 711.

### b.    Statements About X.Labs's Marketing

IPVM argues that the statements that X.Labs's marketing of Feevr was "aggressive" or "misleading" are nonactionable opinion because they are "based on accurate disclosed facts."  (Mot. at 17.)  But these statements are tied to the issue of Feevr's accuracy.  And as the Court noted in *Milkovich*, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact."  497 U.S. at 18.  X.Labs has therefore met its minimal burden here.

### c.    Statements About FDA Approval and the FLIR SDK

IPVM contends that its statements about Feevr's lack of FDA approval and its violation of the FLIR SDK agreement are nonactionable because they are accurate or at least not capable of being proven false.  (Mot. at 13-14; 18-20.)  X.Labs argues that IPVM's statements are defamatory because they incorrectly

---

[4] IPVM denies that X.Labs offered IPVM a unit of Feevr to conduct its tests.  (*See* Reply at 4.)  But as IPVM concedes (Mot. at 9 n.3), the Court must accept X.Labs's allegations as true.  The same goes for IPVM's challenge to the reliability of Dr. Briant's testing of Feevr.

imply that Feevr violates FDA regulations and the FLIR SDK license.  In an update to the first article, IPVM stated that "[t]he FLIR SDK License Agreement prohibits the use of FLIR devices, like the FLIR ONE Pro that Feevr uses, from apps like Feevr's."  (FAC, Ex. 7.)  However, as X.Labs notes from the language of the agreement reproduced in the article, it is the FLIR SDK rather than the FLIR One Pro that may not be used for medical purposes.  (*Id.*)  IPVM later updated the article again to include comments from X.Labs that "Feevr doesn't use the FLIR SDK" but did not alter the statements that Feevr was violating the terms of the FLIR SDK License Agreement.  Whether Feevr utilizes the FLIR SDK (which IPVM later suggests it does to obtain thermal readings) is susceptible to being proven true or false.  (*See* FAC, Ex. 10 at 163 ("Surely, Feevr uses its own custom app but Feevr needs access [to] the temperature data from the FLIR thermal sensor which is what the FLIR SDK provides.").)

While the statements about the FLIR SDK agreement are potentially actionable because they are not based on "accurate, disclosed facts," IPVM's statements that Feevr did not have FDA approval are not actionable.  In its third article, IPVM heavily criticized the FDA for its decision to suspend enforcement of certain regulations of tele-thermographic devices during the pandemic.  (FAC, Ex. 9.)  X.Labs alleges that "IPVM falsely implies that the Feevr system is intended to be used for purposes of requiring FDA approval, that it therefore runs afoul of FDA regulations, and that X.Labs is attempting to conceal this alleged lack of requisite FDA approvals from customers and potential customers of the Feevr system."  (FAC ¶ 61; Mot. at 13.)  But X.Labs concedes that it does not have FDA approval for Feevr (FAC ¶ 61), and IPVM's "intent" is irrelevant in light of this concession.  *See Ringler Associates Inc.*, 80 Cal. App. 4th at 1180 ("truth . . . is a complete defense against civil liability, regardless of bad faith or malicious purpose").  Accordingly, IPVM's statements that Feevr lacked FDA approval are accurate and therefore nonactionable.

In short, X.Labs's claims about purported violations of the FLIR SDK license agreement survive IPVM's anti-SLAPP challenge but its claims about lack of FDA approval do not.

\*       \*       \*

IPVM's anti-SLAPP motion is **DENIED** in large part.  IPVM's statements are matters of public of interest and X.Labs has met its minimal burden to demonstrate that it has a reasonable probability of prevailing on each of the

statements its claims are defamatory with exception of the statements about FDA approval.

## II.    MOTION TO DISMISS

### A.    <u>Legal Standard</u>

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  A plaintiff must state "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6), a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  That is, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Courts "'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Assuming the veracity of well-pleaded factual allegations, a court next must "determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.  There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Id.*

### B.    <u>X.Labs's Remaining Claims</u>

IPVM asserts that if X.Labs's defamation claim fails, the derivative claims also fail.  (Mot. at 20-21.)  Because X.Labs's defamation claim withstands an anti-SLAPP motion under the Rule 12(b)(6) standard, the Court now analyzes X.Labs's remaining claims to determine if they are properly pleaded.

### 1.    **Intentional Interference with Contractual Relations**

To state a claim for intentional interference with contractual relations, X.Labs must show:  "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or

disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

IPVM argues that X.Labs fails to properly allege that it knew of X.Labs's contracts and that its actions were designed to induce a breach.  (Mot. at 21-22.)  In its FAC, X.Labs alleges that it "possesses and possessed valid contracts with various customers, including Fortune 500 customers, to provide the Feevr system," and that it had supplier contracts with "FLIR for the FLIR ONE Pro camera, and had a software and integration agreement with Fusus."  (FAC ¶ 120.)  In the next paragraph, X.Labs alleges that "IPVM is and, at all material times, has been aware of the existence of these contracts."  (Id. ¶ 121.)  This is a conclusory statement that fails to satisfy the *Twombly*/*Iqbal* standard.  X.Labs does not allege any detail about IPVM's knowledge of the alleged contracts, only that IPVM knew X.Labs was "selling a lot of these devices."  Likewise, X.Labs fails to offer nonconclusory allegations that the statements were designed to induce the breach.  (*See id.* ¶ 122 (conclusorily alleging that "the purpose in publishing the IPVM Articles . . . was and is to disrupt these contracts.").)

The Court therefore **GRANTS** IPVM's Motion as to X.Labs's intentional interference with contractual relations claim.  X.Labs's first claim for relief is **DISMISSED with leave to amend**.

## 2.    Intentional or Negligent Interference with Prospective Economic Relations

To state a claim for intentional interference with prospective economic relations, X.Labs must show "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Youst v. Longo*, 43 Cal. 3d 64, 71 n. 6 (1987).  In addition, X.Labs must establish that IPVM "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* 11 Cal. 4th 376, 393 (1995).

X.Labs alleges that "[b]efore IPVM's smear campaign, X.Labs was actively developing business relationships to provide the Feevr system to potential customers.  These business relationships would likely have resulted in significant sales by X.Labs of its Feevr system."  (FAC ¶ 136.)  Because of the articles, some

customers suspended their orders (or "raised concerns"), some prospective customers "severed their business relationships with X.Labs," and some suppliers suspended or terminated their agreements. (*Id.* ¶¶ 111-114.)

These allegations are deficient.  First, X.Labs fails to allege a previous business relationship with its prospective customers.  "Without an existing relationship with an identifiable buyer, [plaintiff's] expectation of a future sale was 'at most a hope for an economic relationship and a desire for future benefit.'" *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1117 (C.D. Cal. 2015) (quoting *Westside Ctr. Associates v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996)).  Second, X.Labs fails to offer nonconclusory allegations that IPVM knew of any such relationships. (*See* FAC ¶¶ 137, 154 (conclusorily asserting that that "IPVM is and, at all material times, has been aware of X.Labs's prospective contractual relationships")).  Third, X.Labs has failed to plead that IPVM owed it a duty of care to support its claim of negligent interference with prospective economic relations claim.  *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1313 (N.D. Cal. 1997) (noting that a duty "may arise from a contractual, statutory, or 'special relationship' between the plaintiff and defendant").

The Court therefore **GRANTS** IPVM's Motion as to X.Labs's intentional and negligent interference with prospective economic relations claims.  X.Labs's second and third claims for relief are **DISMISSED with leave to amend**.

### 3.    Trade Libel

"Trade libel is the intentional disparagement of the quality of property that results in pecuniary damage to the plaintiff."  *Piping Rock Partners*, 946 F. Supp. 2d at 981 (citing *Nichols v. Great Am. Ins. Companies*, 169 Cal. App. 3d 766, 773 (1985)).  To state a claim for trade libel, X.Labs must show: "(1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) induced others not to deal with it, and (6) caused special damages." *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004) (quoting *Atlantic Mut. Ins. Co. v. J. Lamb. Inc.*, 100 Cal.App.4th 1017, 1035, 123 Cal.Rptr.2d 256 (2002)).

IPVM first argues that X.Labs fails to state a claim for trade libel because it has not demonstrated that its statements were false.  (Mot. at 25.)  The Court has rejected that argument in denying the anti-SLAPP motion.  Next, IPVM argues that X.Labs fails to adequately allege special damages.  Special damages must be pleaded with specificity under Fed. R. Civ. 9(g).  "A bare allegation of the amount

of pecuniary loss is insufficient for the pleading of a trade libel claim." *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1047 (C.D. Cal. 1998). However, Rule 9(g) does not necessarily require the dollar amount of special damages to be set out in the pleading. *Dryer v. Hyter Management Co.*, No. CV04-8699-MMM (FMOx), 2005 WL 8156194, at *4 (C.D. Cal. Apr. 12, 2005).

IPVM argues that X.Labs fails to meet this standard because it alleges "significant lost sales revenues and profits" to be calculated "according to proof in an amount to be determined at trial." (Mot. at 25 (quoting FAC ¶ 200).) While X.Labs does allege certain dollar amounts, its identification of customers that refused to deal with it because of the alleged trade libel is lacking. For example, X.Labs alleges that "a customer that is an international American publicly traded web hosting company" and "an American social media corporation customer and a Japanese e-commerce company" suspended their orders. (FAC ¶ 111.) Though X.Labs states it is subject to confidentiality agreements, this does not excuse its pleading burden. As for those customers or potential customers that are identified (e.g., Exxon Mobil, BP America, U.S. Foods, Coca-Cola, Major League Baseball, the New Mexico Government, and Westrock (*id.* ¶¶ 112-113)), X.Labs fails to allege damages.

The Court therefore **GRANTS** IPVM's Motion as to X.Labs's trade libel claim. X.Labs's fifth claim for relief is **DISMISSED with leave to amend**.

### 4.    California Unfair Competition and False Advertisement Statutes

To state a claim for unfair competition under California Business and Professions Code § 17200, X.Labs "must establish that the practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)." *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1022 (N.D. Cal. 2007) (quoting *Albillo v. Intermodial Container Servs., Inc.*, 114 Cal. App. 4th 190, 206 (2003)).

To state a claim for false advertising under California Business and Professions Code § 17500, X.Labs must allege: "(1) An untrue or misleading statement; (2) Which is known, or reasonably should be known, to be untrue or misleading; and (3) Is made to dispose of goods, perform services, or induce

obligations." *Arakelian v. Mercedes-Benz USA, LLC*, No. CV 17-06240 TJH (RAOx), 2018 WL 6422649, at *4 (C.D. Cal. June 4, 2018)

IPVM argues that X.Labs's consumer protection related claims fail because the statements within the articles do not constitute commercial speech. (Mot. at 27.) "California's consumer protection laws, like the unfair competition law, govern only *commercial* speech . . . . Noncommercial speech is beyond their reach." *Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 140 (2004) *disapproved on other grounds by FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 148 (2019). Commercial speech is "speech that does 'no more than propose a commercial transaction.'" *Id*. at 141 (internal citation omitted); *see Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (so defining commercial speech). In the context of consumer protection, commercial speech "must consist of factual representations about the business operations, products, or services of the speaker . . . made for the purpose of promoting sales of, or other commercial transactions in, the *speaker's products or services*." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 962 (2002) (emphasis added). While X.Labs generally argues that IPVM's articles were driven by a business interest to increase traffic to its website and to assist FLIR in selling more expensive thermal cameras (Opp. at 27-28), X.Labs does not specify a proposed transaction that is to be made along with the commentary and product review. IPVM's articles, which at bottom are essentially negative product reviews, do not propose a commercial transaction. Indeed, the articles are about X.Labs's products, not IPVM's. Accordingly, IPVM's commentary is noncommercial speech.

The Court therefore **GRANTS** IPVM's Motion as to X.Labs's California unfair competition and false advertising claims. X.Labs's sixth and ninth claims for relief are **DISMISSED without leave to amend**.

### 5.    Common Law Unfair Competition

"The common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992). IPVM argues, and X.Labs apparently concedes, that X.Labs has failed to allege that IPVM is attempting to pass off any of X.Labs's goods. (Mot. at 27.) The Court therefore finds this claim is abandoned. *Stichting Pensioenfonds ABP v. Countrywide Fin.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (failure to oppose "constitutes waiver or abandonment").

The Court therefore **GRANTS** IPVM's Motion as to X.Labs's common-law unfair competition claim.  X.Labs's seventh claim for relief is **DISMISSED without leave to amend**.

### 6.    Lanham Act

Under section 1125 of the Lanham, there are "two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B).  *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).  Although the FAC does not specify, X.Labs concedes that its Lanham Act claim is brought under section 1125(a)(1)(B).  (Opp. at 29.)

To state a claim under section 1125(a)(1)(B), X.Labs must show "an injury to a commercial interest in reputation or sales" and "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising."  *Lexmark*, 572 U.S. at 132, 134.  For representations to constitute commercial advertisement, "they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant purchasing public. . . ."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999).  Assuming but not deciding that X.Labs has standing to bring a false advertising claim, X.Labs's claims still fail because the articles are not commercial speech.  (*See* discussion *supra*.)  Nor has X.Labs alleged that IPVM made the challenged statements for the purpose of influencing its readers to purchase its own products.  Accordingly, X.Labs cannot meet the requirements for "commercial advertising or promotion" under the Lanham Act.

The Court therefore **GRANTS** IPVM's Motion as to X.Labs's Lanham Act claim.  X.Labs's eighth claim for relief is **DISMISSED without leave to amend**.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, IPVM's anti-SLAPP motion is **DENIED** except as to the statements about FDA approval.  IPVM's Rule 12(b)(6) motion is **GRANTED** as to X.Labs's remaining claims.  If X.Labs wishes to file a Second Amended Complaint, it must do so by January 15, 2021.